# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CLAIM JUMPER RESTAURANTS, LLC *et al.*, | ) | Case No. 10-12819 (PJW) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. [1] | ) | |
| | ) | |

## DECLARATION OF WILLIAM G. TAVES, CHIEF FINANCIAL OFFICER, IN SUPPORT OF THE DEBTORS' FIRST DAY MOTIONS AND APPLICATIONS

I, William G. Taves, declare as follows:

1.     I am the Chief Financial Officer (the "CFO") of Claim Jumper Restaurants, LLC ("CJR") and Claim Jumper Management, LLC ("CJM"), debtors and debtors in possession in the above-captioned chapter 11 bankruptcy cases (collectively, "Claim Jumper" or the "Debtors"). I have served as Claim Jumper's CFO since January 2009. As of September 4, 2010, I also have served as a member of the board of managers of CJR. I also am a Certified Public Accountant, on inactive status. As CFO, I am authorized to submit this declaration on behalf of the Debtors.

2.     I previously served as the CFO for two of the Debtors' affiliates, Claim Jumper Restaurant Holdings Corp., a Delaware corporation ("Holdco"), and Gold Rush Purchase Corp. a Delaware corporation ("GRPC"), that have not commenced chapter 11 cases. Effective as of September 10, 2010, but prior to the commencement of these chapter 11 cases, I resigned as CFO of those two entities.

---

[1] The Debtors in these cases along with the last four digits of each of the Debtors' federal tax identification numbers are: Claim Jumper Restaurants, LLC (1053) and Claim Jumper Management, LLC (6481). The Debtors' headquarters and mailing address is: 16721 Millikan Ave., Irvine, CA 92606.

3.      I am familiar with the Debtors' books and records, day-to-day operations, business affairs and financial condition, and with the facts and circumstances surrounding the Debtors' First Day Motions, their debtor-in-possession financing commitment, the agreements under which they propose to sell substantially all their assets, the commencement of these Chapter 11 Cases, and the key operational and strategic decisions made by the Debtors' senior management and Boards of Managers in connection therewith. If called upon to testify, I would and could testify competently to the facts set forth herein.

4.      No one individual has personal knowledge of all the facts in this Declaration. All facts set forth herein are based upon my personal knowledge of and familiarity with the Debtors' operations and finances, information learned from my review of the relevant documents, information supplied to me by other members of the Debtors' management, the Debtors' professionals or employees of the Debtors working under my supervision, or my opinions based upon experience, knowledge and information concerning the Debtors and the industry in which the Debtors operate.

5.      On September 10, 2010 (the "Petition Date"), the Debtors commenced cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware.

6.      In order to enable the Debtors to minimize the adverse effects of the commencement of the Chapter 11 Cases on their business, the Debtors have requested various types of relief in "first-day" motions, as well as in motions and applications that will be filed shortly after the Petition Date and that will require hearing within the first thirty days of the cases (collectively, the "First Day Motions"). The First Day Motions seek relief aimed at, among other things, maintaining the Debtors' existing cash management system and insurance policies, bolstering employee morale and vendor and customer confidence and ensuring that the Debtors

have sufficient capital resources to continue to operate their business while in chapter 11. Although certain of the First Day Motions require hearings before the Bankruptcy Court (the "Court") on an expedited basis (for reasons set forth below) and the others are capable of being heard on regular notice during the first month of the Chapter 11 Cases, all of the First Day Motions are critical to the Debtors' success in chapter 11.

7.     In addition to the First Day Motions, the Debtors concurrently have filed two separate, but related, motions relating to the sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code (collectively, the "Sale Motions"). The first of the Sale Motions seeks the entry of an order establishing auction and bidding procedures relating to the proposed sale of the Debtors' assets. The second Sale Motion seeks the entry of an order approving the sale of the Debtors' assets to the Buyer (defined below), subject to a higher and better offer that may be obtained at the Auction.

8.     As discussed in greater detail below, the Debtors are insolvent and believe a prompt sale of the Debtors' assets is necessary to maximize and preserve the value of the Debtors' business. The Debtors currently do not have sufficient cash resources or committed financing outside of bankruptcy to operate their businesses and service their existing debt obligations in the long term. The Debtors also are in default under each of their principal prepetition credit facilities and do not have any forbearance agreement from their prepetition senior secured lenders. In addition, the Debtors are informed that their prepetition senior secured lenders, who have liens on substantially all of the Debtors' assets including the Debtors' cash, are severely undersecured and unwilling to fund the Debtors through a traditional plan of reorganization process. Furthermore, absent a prompt sale of their assets, the Debtors believe the value of their business will significantly decline, particularly as a buyer will not be able to realize the additional revenues that the Debtors generate during the upcoming holiday season which, in

turn, would very likely lead to a lower sale price. Accordingly, the Debtors are seeking to effectuate a sale of their assets within a 60 to 75 day time frame.

9.     I submit this declaration in support of the Debtors' petitions, the First Day Motions and the Sale Motions. Any capitalized terms not expressly defined herein shall have the meaning ascribed to them in the relevant First Day Motion or Sale Motion. Part I of this declaration describes the Debtors' business and the circumstances surrounding the commencement of these Chapter 11 Cases. Part II sets forth the relevant facts in support of the First Day Motions filed concurrently herewith. Part III sets forth the relevant facts in support of the Sale Motions.

## Part I

### The Debtors' Business and Brief History

10.     The Debtors' principal business is the operation of 45 western-style full-service restaurants that provide guests with a wide array of menu selections. The Debtors operate under the trade name "Claim Jumper."

11.     Founded in 1977 by Craig Nickoloff, the first Claim Jumper restaurant was located in Los Alamitos, California. As of the Petition Date, the Claim Jumper restaurant chain operates in 8 states primarily in the Western United States, Wisconsin and Illinois, with 27 of their 45 restaurants located are in California. The Debtors employ approximately 4,600 persons. The Debtors' employees are not unionized.

12.     In August 2004, the owning and operating the Claim Jumper restaurants open at that time were merged together through a stock swap transaction into CJR. Since that time, CJR has been the entity that primarily operates the Claim Jumper restaurant chain.

13.     In October 2005, the Debtors entered into a Contribution and Merger Agreement (the "Merger Agreement") wherein CJR's stockholders exchanged their stock for

cash and/or ownership in newly created Holdco. In connection with the Merger Agreement, CJR borrowed $33.1 million under the Prepetition Credit Agreement (defined below) and issued $50.0 million in Subordinated Notes (defined below), for a total of $83.1 million in indebtedness. Additionally, the Debtors received $100.2 million in connection with issuing new stock under the Merger Agreement. A portion of these funds, along with the funding provided by the new credit facilities, were used to complete a stock buyback whereby the Debtors paid $115.7 million to CJR's then-existing stockholders. As a result of these transactions, certain funds controlled by Leonard Green Partners, L.P. (the "Leonard Green Entities") became the majority holders of the newly issued common and preferred shares in Holdco. At the time of the Merger Agreement, CJR owned and operated 33 locations.

14.     Following the Merger Agreement, and as of the Petition Date, the corporate structure of the Debtors is as follows: Holdco is the top-level parent company, a non-operating entity, that directly and indirectly owns each of the Debtors. GRPC is a non-operating entity that directly owns approximately 75% of the equity interests in Debtor CJR. CJR, a Delaware limited liability corporation, is the operator of all of the restaurants in the Claim Jumper restaurant chain, is the primary operating entity among the Debtors' businesses and owns all of the assets that the Debtors are seeking to sell. Debtor CJM is a wholly-owned subsidiary of CJR and employs all of the employees who work in the restaurants operated by CJR. Neither Holdco nor GRPC is a debtor in these chapter 11 cases. An organizational chart evidencing the corporate relationship between each of the Debtors, Holdco and GRPC is attached hereto as Exhibit 1.

**Summary of Obligations to Prepetition Secured and Unsecured Creditors**

15.     As of the Petition Date, the Debtors' principal liabilities and obligations are as set forth below.

<u>Prepetition Secured Credit Facility</u>

16.     In connection with Merger Agreement, CJR entered into that certain

Credit Agreement, dated October 28, 2005 (as amended, modified, restated or supplemented

from time to time, the "Prepetition Credit Agreement"), between CJR, as borrower, Wells Fargo

Bank, National Association ("Wells Fargo), as Administrative Agent ("Prepetition Agent"), and

Wells Fargo, GE Franchise Finance, and Bank of the West, as Lenders (collectively, the

"Prepetition Lenders; together with the Prepetition Agent, the "Prepetition Secured Parties").

The Prepetition Credit Agreement memorializes a $75.0 million revolving credit facility and

letter of credit subfacility.  CJR's obligations under the Prepetition Credit Agreement are

guaranteed by CJM, Holdco and GRPC pursuant to that certain Guaranty Agreement dated

October 28, 2005 (the "Prepetition Guaranty").

17.     As of the Petition Date, the Debtors were in default of their financial

covenants under the Prepetition Credit Agreement and thus had no availability thereunder.  The

outstanding balance due under the Prepetition Credit Agreement as of the Petition Date is

approximately $74.1 million, which is comprised of $62.1 million in cash borrowings, $4.9

million in issued and outstanding Letters of Credit and $7.1 million in accrued but unpaid

interest (the "Prepetition Obligations").  The Debtors have not paid interest, which accrues at the

default rate of prime plus 7.5%, since May 2009.

18.     Pursuant to that certain Security Agreement dated as of October 28, 2005

(the "Prepetition Security Agreement") by and among the Debtors, Holdco and GRPC and the

Prepetition Agent, the Debtors, Holdco and GRPC granted liens on and security interests in all of

their personal property (the "Prepetition Collateral") to the Prepetition Agent, on behalf of the

Prepetition Secured Parties, to secure the Debtors' obligations under the Prepetition Credit

Agreement and the Prepetition Guaranty.  Included in the Prepetition Collateral are the equity

interests of GRPC held by Holdco (the "GRPC Shares") and the equity interests of CJR held by Holdco and GRPC (the "CJR Shares"). I am informed and believe that the Prepetition Agent's security interests and liens are valid, perfected and have priority over any and all other liens against the Prepetition Collateral. The Prepetition Secured Parties do not have any liens or security interests in the Debtors' real property leases.

Senior Subordinated Notes due 2013

19.     In connection with the Merger Agreement, CJR also issued $50.0 million in Senior Subordinated Notes due 2013 (the "Subordinated Notes") pursuant to that certain Purchase Agreement, dated as of October 28, 2005 (as amended, modified, supplemented or restated from time to time, the "Note Purchase Agreement") between Holdco, GRPC, CJR and certain other parties thereto. On July 26, 2006 the Debtors issued an additional $20 million in Subordinated Notes. All of the outstanding Subordinated Notes currently are held by Black Canyon Capital LLC, either directly or indirectly through its affiliate, Private Capital Partners LLC (collectively, "Black Canyon"). Pursuant to an amendment to the Note Purchase Agreement, CJR's obligations with respect to the Subordinated Notes are guaranteed by CJM, Holdco and GRPC. The Note Purchase Agreement specifically provides that the Subordinated Notes are subordinate and subject in right of payment to the prior payment in full of all obligations under the Prepetition Credit Agreement and loan documents related thereto.

20.     As of the Petition Date, CJR was in default of certain financial covenants and required interest payments due under the Note Purchase Agreement, and the outstanding balance due under the Subordinated Notes was approximately $111.8 million, consisting of $70 million in principal and $41.8 million in deferred interest.

21.     Pursuant to that certain Pledge Agreement dated November 17, 2008 (as amended, modified, supplemented or restated from time to time, the "Pledge Agreement")

between Holdco, certain of the Leonard Green Entities, Black Canyon and certain other parties, the Leonard Green Entities pledged their common and preferred equity interests in Holdco (the "Holdco Equity Interests") to Black Canyon as collateral to secure the Debtors' obligations under the Subordinated Notes.

Other Debt Obligations

22.     The Debtors owe approximately $0.3 million in long-term debt relating to capital leases for equipment used in the Debtors' restaurants and corporate headquarters. In addition, as of the Petition Date, the Debtors owe approximately $11.1 million in trade, vendor and general unsecured debt (excluding payroll).

**Events Leading to Chapter 11 Filings**

*Debtors' Expansion Efforts and the National Economic Downturn*

23.     In late 2006, following the consummation of the Merger Agreement, the Debtors continued to pursue a strategy of expanding their business by opening new restaurant locations. Between 2006 and 2008, the Debtors opened 13 new locations, resulting in a total of 46 restaurants, and spent $62.9 million in construction costs associated with opening those locations. The primary funding source for the new restaurant construction was from $59 million in borrowings under the Prepetition Credit Agreement and the issuance of the Subordinated Notes.

24.     Despite the Debtors' efforts to expand and increase revenues, in 2007, the Debtors began to experience a prolonged downturn in their revenues and profits, coinciding with the broader economic downturn in the United States. In fact, the Debtors' financial performance worsened in each of fiscal years 2007, 2008 and 2009. Annual revenues of approximately $293 million in 2007 diminished to $250 million in 2008 and to $233 million in 2009. Declines in

annual operating profits followed. Operating profits and losses in fiscal years 2007, 2008 and 2009 were $6.3 million, ($5.2) million, and ($5.8) million, respectively.

25. The deterioration in the Debtors' revenues and profits can be attributed to several factors. More than 75% of the Debtors' restaurants are located in California, Arizona and Nevada communities that have seen significant increases in unemployment since 2007 and have been hit particularly hard by the home mortgage crisis. In addition, the Debtors believe that the recent national recession has left much of the general public less prone to spending their disposable income, particularly on relative "luxuries" such as dining at restaurants of the caliber of those operated by the Debtors. As a result, the Debtors have experienced fewer dining guests in their restaurants and consequently sales have declined significantly since 2006. For the fiscal 2009 year, sales were down 29% for those locations that operated for all of fiscal 2006. Year-over-year comparable restaurant sales have declined every year since 2006. Comparable store sales declined (5.0%) in 2007, (14.1%) in 2008 and (14.2%) in 2009.

### *Going Concern Qualification and Defaults under Prepetition Credit Facilities*

26. In early 2009, the Debtors' independent auditors, Ernst & Young, noted in their report on the Debtors' 2008 financial statements that the financial constraints the Debtors were facing raised substantial doubt about the Debtors' ability to continue as a going concern. This going concern qualification, together with a lack of availability under the Prepetition Credit Agreement based on a prior covenant default, led to the Debtors' vendors tightening trade credit. In an effort to entice vendors to continue shipping product, the Debtors were forced to accelerate payments to certain vendors, which, in turn, limited the Debtors' ability to fund other obligations as they became due.

27. In February 2009, the Debtors notified the Prepetition Secured Parties that the Debtors were in default of the Prepetition Credit Agreement as a result of violation of certain

financial covenants and that the Debtors did not expect to satisfy the covenants on a go-forward basis. The Debtors further advised the Prepetition Secured Parties that the Debtors would not be able to make the scheduled interest payments under the Prepetition Credit Agreement in full without impairing the Debtors' ability to conduction day-to-day operations.

*Contemplation of Restructuring Alternatives and Forbearance Agreement*

28.     As a result of these defaults and the Debtors' deteriorating financial position, the Debtors commenced discussions with the Prepetition Secured Parties regarding potential restructuring transactions that would best maximize the value of the Debtors' business and assets.  In addition, the Debtors engaged Milbank, Tweed, Hadley & McCloy LLP ("Milbank") as their counsel and Piper Jaffray & Co. ("Piper Jaffray") as their investment banker to assist the Debtors in exploring various strategic restructuring alternatives.

29.     In conjunction with its advisors, the Debtors concluded that their forecasted revenues were, and would continue to be, insufficient to adequately fund both the Debtors' business operations and their debt service requirements.  Thus, following additional consultation with their advisors, the Debtors determined that, given their overly leveraged financial position, their conclusions about the valuation of the Debtors' business, and the severely undersecured position of the Prepetition Secured Parties, the most effective way to preserve the Debtors' going concern value for the benefit of creditors was through a sale of the Debtors' assets following a thorough marketing process.

30.     In order to provide the Debtors with additional breathing room to pursue a potential sale transaction, in May 2009, while continuing discussions with the Debtors, the Prepetition Secured Parties agreed to defer the receipt of interest due under the Prepetition Credit Agreement.  Shortly thereafter, the Debtors and the Prepetition Secured Parties entered into that certain Limited Forbearance Agreement dated July 1, 2009 (the "Forbearance Agreement")

whereby the Prepetition Secured Parties agreed to forbear from exercising their rights and remedies under the Prepetition Credit Agreement based on the existing defaults. The Forbearance Agreement established certain milestone dates related to Piper Jaffray's engagement and pursuit of a marketing process, and, barring no further defaults by the Debtors under the Prepetition Credit Agreement, was scheduled to expire on September 30, 2009. The Prepetition Secured Parties subsequently agreed to extend the expiration date of the Forbearance Agreement to November 30, 2009 and then to February 28, 2010.

### *The Prepetition Marketing Process*

31.    In June 2009, Piper Jaffray began a full-blown marketing process in contemplation of a proposed sale of the Debtors' assets as an ongoing business. By the end of July 2009, Piper Jaffray had reached out to and received interest from approximately 50 prospective buyers. In August and September 2009, the Debtors and Piper Jaffray conducted meetings with 8 of the prospective buyers that the Debtors believed were most likely to be able to consummate a sale transaction.

32.    Following this initial marketing, the Debtors and Piper Jaffray commenced a bidding process among the various prospective buyers for the purchase of the Debtors' assets as an ongoing business. During the first round of bidding, the Debtors received bids from 17 of the prospective buyers. Piper Jaffray then selected 13 first round bidders for a second round. Based on the Debtors' and Piper Jaffray's review and analysis, the first-round bids presented a range of value for the Debtors business of between $31.6 million and $55.0 million, which was below the Debtors' estimated valuation of their business and well below the face amount of the Prepetition Obligations.

33.    In October 2009, Piper Jaffray had follow-up discussions with the prospective buyers that had submitted the five highest first round bids. Pursuant to those

discussions and further due diligence on the part of these prospective buyers, two bidders joined their bids together, resulting in four final round bids. After a thorough review and analysis of the second-round bids by the Debtors and its advisors, and upon consultation with the Prepetition Secured Parties, the Debtors determined that, at that time, the bid submitted by the buying group composed of Black Canyon and Bruckmann, Rosser, Sherrill & Co., Inc. (collectively, the "Black Canyon/BRS Group") represented the highest and best offer for the Debtors' business and assets. The Black Canyon/BRS Group's bid contemplated the buyer's acquisition of the Prepetition Secured Parties' debt for a combination of cash and new notes, and that the buyer would use such debt to credit bid for the Debtors' assets. As such, the Black Canyon/BRS Group's was necessarily conditioned upon the consent and participation of the Prepetition Secured Parties

*Exclusivity Agreement and the Impasse between the Prepetition Secured Parties and Black Canyon/BRS*

34. Shortly after the completion of the first bidding process, the Debtors, the Prepetition Secured Parties and the Black Canyon/BRS Group entered into that certain Exclusivity Agreement dated December 31, 2009 (as amended, modified, supplemented or restated from time to time, the "Exclusivity Agreement"). The Exclusivity Agreement was designed to provide the Black Canyon/BRS Group with adequate time to complete its due diligence and negotiate the definitive documentation for the proposed sale transaction. The Exclusivity Agreement provided that until its termination, neither the Debtors nor any of the Prepetition Secured Parties would market, or engage in any discussions with the third parties regarding the sale of, the Debtors' assets.

35. The Debtors, Prepetition Secured Parties and the Black Canyon/BRS Group then spent approximately seven months negotiating the terms of the transaction

documents. Ultimately, however, the Prepetition Secured Parties and the Black Canyon/BRS Group were unable to reach an agreement over the final economic terms and conditions of the proposed transaction. Furthermore, on April 19, 2010, the Prepetition Agent, on behalf of the Lenders, delivered a notice to the Debtors and the Buyer stating that the Lenders were terminating the Exclusivity Agreement as it applied to them. Subsequently, on June 28, 2010, the Debtors provided notice that they also were terminating the Exclusivity Agreement as it applied to them in order to permit the Debtors to explore other alternatives.

*The Debtors' Renewed Marketing Efforts, Selection of the Stalking Horse Buyer and Execution of Asset Purchase Agreement*

36.     Following the break-down of the discussions between the Prepetition Secured Parties and the Black Canyon/BRS Group, and given their dwindling cash position, the Debtors quickly determined that they had few remaining restructuring options other than a prompt sale of their assets. The Prepetition Secured Parties advised the Debtors that they were no longer willing to pursue a transaction with the Black Canyon/BRS Group or any other transaction that would involve the Prepetition Secured Parties rolling or taking back any new debt issued either by the Debtors or a purchaser of the Debtors' assets, and subsequently let a forbearance agreement with respect to the exercise of their remedies expire. In addition, the Debtors' determined that a process involving a plan of reorganization in all likelihood would be non-consensual and extremely difficult to achieve, given the extremely undersecured position of the Prepetition Secured Parties and their reluctance to take back any debt issued by the Debtors. Moreover, the Debtors did not believe that any third party would be willing to sponsor a plan process against the objections of the Prepetition Secured Parties, particularly given the unlikelihood that such third party could prime the banks in the context of debtor-in-possession or exit financing.

DOCS_DE:163470.1
#4826-3023-1045v9

37.     Accordingly, after consultation with their advisors, the Debtors determined that the best course of action that would maximize the value of the estates would be to renew the marketing process, on a somewhat compacted timeline, and solicit bids from potential buyers for a straight-cash purchase of the Debtors' assets. The timing of the marketing process was somewhat constrained by the upcoming holiday season and the Debtors' belief that completing a sale quickly would provide a better purchase price given the additional revenues that a buyer could expect over the holidays (both from increased dining and gift card sales).

38.     To that end, on or about July 14, 2010, the Debtors and Piper Jaffray reached out to no less than 20 various prospective buyers (including both entities that been contacted in the initial 2009 marketing effort and entities that only recently had expressed interest in purchasing the Debtors' business) and asked that such prospective buyers submit bids, without any financial or diligence conditions, for the purchase of the Debtors' assets by late August 2010. During this period, Piper Jaffray provided the prospective buyers access to a data room containing various financial and legal documents relating to the Debtors, and the Debtors held management presentations with several of the prospective buyers.

39.     At the conclusion of the diligence period, the Debtors had received bids with little or no financing or diligence conditions from three separate entities. The Debtors and their advisors then negotiated with each of these bidders in order to further maximize the proposed aggregate consideration being provided by these parties and maximize closing risk and potential constraints on the post-petition marketing and sale process. Following these additional negotiations, on September 6, 2010, the Debtors determined that Black Canyon had submitted the highest and best offer for the purchase of the Debtors' assets and had provided sufficient evidence that it was capable of consummating the sale transaction. The Debtors and their

advisors then worked on negotiating the definitive terms and documentation for Black Canyon's purchase of the Debtors' assets.

40.     On September 10, 2010, the Debtors entered into that certain Asset Purchase Agreement (the "Agreement") with GRP Acquisition Corp., a Delaware corporation (the "Buyer"), an affiliate of Black Canyon, pursuant to which the Buyer will purchase substantially all of the Debtors' assets and receive assignment of certain contracts and leases (collectively, the "Assets"). A copy of the Agreement, omitting certain schedules and exhibits, is attached hereto as Exhibit 2.

41.     The principal terms of the Buyer's stalking horse bid are as follows: The aggregate consideration for the sale and transfer of the Assets shall be (i) cash in the amount of $24.5 million, and (ii) the assumption of the Assumed Obligations (as defined in the Agreement), which include (A) the assumption of certain Assumed Seller Obligations (as defined in the Agreement), and (B) the assumption of up to $23.2 million of Assumed Seller Pre-Closing Obligations (as defined in the Agreement), and (C) up to $5 million of cash used as collateral for certain of the Debtors' letters of credit related to their workers' compensation obligations. A more detailed summary of the Agreement is provided in Part III below.

42.     In order to maximize the value of the Assets for the benefit of all of its creditors, the Agreement contemplates that the Debtors would commence these Chapter 11 Cases and subject the proposed sale of the Assets to a Court-approved auction and sale process and higher and better offers. The Debtors intend to use their existing cash on hand and contemplated debtor-in-possession ("DIP") financing to be provided by one or more of the Debtors' prepetition secured lenders to fund the bankruptcy and sale process. The Debtors are informed that the Prepetition Agent has the requisite consent from the Prepetition Secured Parties to use their cash

collateral for this sale process pursuant to the terms of the proposed order approving cash collateral usage and the budget attached thereto.

43.     In addition, the Debtors' have received a commitment letter from the Prepetition Agent with respect to the provision of $5 million through a DIP financing agreement (which DIP financing agreement the Debtors anticipate they will present to the Court for its approval in the near term). A copy of Wells Fargo's commitment letter is attached hereto as Exhibit 3. The Agreement provides that the Debtors must execute a DIP financing agreement and file a motion with the Court seeking approval of such DIP financing agreement by no later than September 15, 2010. If the Debtors do not satisfy the condition, the Buyer may then terminate the Agreement, receive a refund of its initial deposit of $1,450,000, and seek reimbursement of its fees and expenses.

### *Exercise of Remedies by Black Canyon and the Prepetition Secured Parties*

44.     On August 30, 2010, Black Canyon delivered a notice to Holdco, the Debtors' indirect parent, that Black Canyon had exercised its proxy rights under the Pledge Agreement to vote the Holdco Equity Interests and had removed the existing board members of Holdco, Timothy J. Flynn and Kris Galashan, both of whom are principals or employees of Leonard Green Partners, L.P. (the "Black Canyon Notice"). The Black Canyon Notice also elected two new directors to the Holdco board, Stanley Stein and Thomas Paccioretti, and attached certain documentation that purported to (i) remove Messrs. Flynn and Galashan from the boards of GRPC and CJR, and (ii) replace them with Messrs. Stein and Paccioretti.

45.     On September 3, 2010, the Prepetition Agent, on behalf of the Prepetition Secured Parties, provided notice to the Debtors that it had exercised its proxy rights under the Prepetition Security Agreement to vote the GRPC Shares to remove the Holdco directors from GRPC's board and replace them with the Messrs. Flynn and Galashan. To the best of the

Debtors' knowledge, as of the Petition Date, neither Black Canyon nor the Prepetition Secured Parties have taken any further action that would affect the composition of the Debtors' boards of directors.

### *Debtors' Lack of Liquidity as of the Petition Date and the Debtors' Decision to Commence These Cases*

46.     As of the Petition Date, the Debtors had less than $3.3 million in cash on hand, which cash remained subject to the perfected liens of the Prepetition Secured Parties. In addition, the Debtors had accumulated but not paid more than $48.8 million in total unpaid interest under the Prepetition Credit Agreement and the Subordinated Notes. Moreover, as a result of the existing defaults, the Debtors had no further availability under the Prepetition Credit Agreement and had no forbearance agreement from either the Prepetition Secured Parties or Black Canyon.

47.     The Debtors also remained concerned that, given the upcoming holiday season, the Debtors would be faced with the very real risk that they would either lose their proposed Buyer and the other stalking horse bids if the Debtors did not consummate the sale of their assets in the near term, or that, at the very least, the final purchase price would be negatively impacted with any further delays. In addition, any uncertainty regarding the Debtors' future during the holidays would likely negatively impact gift card sales, which are a major source of the Debtors' revenue, and would therefore likely depress the final purchase price.

48.     The Debtors also determined that commencement of the bankruptcy cases around the Labor Day weekend would work best from a payroll perspective. By filing on the Petition Date, the Debtors believe they will be able to obtain first day relief from this Court in advance of the Debtors' next scheduled disbursement of payroll on September 14, 2010, which will help minimize any disruptions in the Debtors' work force.

49.     Accordingly, after taking all these factors into consideration, on September 10, 2010, the Debtors' board of managers authorized the Debtors to commence these cases and pursue the sale of the Debtors' assets pursuant to the Purchase Agreement or a higher and better offer at auction.

## Part II - First Day Motions

**I.     Administrative Motions**

**A.     Motion of Debtors for an Order Directing Joint Administration of Related Bankruptcy Cases**

50.     The Debtors in these cases are affiliated entities.  In light of the fact that CJR and its three affiliates have each filed petitions in this Court, the Court can and should jointly administer the Chapter 11 Cases.  Joint administration of these Chapter 11 Cases will (a) ease the administrative burden on the court and the parties; (b) protect creditors of different estates; and (c) simplify the United States Trustee's supervision of the administrative aspects of these Chapter 11 Cases.  Accordingly, I believe that the relief requested in the joint administration motion is in the best interest of the Debtors estates.

**II.    First Day Motions Related to Operations**

**B.     Motion of the Debtors for Entry of an Order Under 11 U.S.C. §§ 363, 364, 1107 and 1108 (I) Authorizing (A) Continued Use of Existing Cash Management System, (B) Maintenance of Existing Bank Accounts, (C) Continued Use of Existing Business Forms and; (II) Granting Superpriority Administrative Priority Status to Postpetition Intercompany Claims; and (III) Authorizing Continued Performance Under Intercompany Arrangements and Historical Practices ("Cash Management Motion")**

51.     In the ordinary course of business, the Debtors maintain five primary bank accounts and 46 "subaccounts" (45 of which are in use) through which Debtor CJR manages cash receipts, transfers and disbursements for the Debtors' entire corporate enterprise (the "Cash Management System").  A schedule identifying all of the Debtors' prepetition bank accounts

(collectively, the "Prepetition Bank Accounts") is attached as Exhibit A to the Cash Management Motion. A diagram describing the Cash Management System is attached as Exhibit B to the Cash Management Motion.

52. The Debtors routinely deposit, withdraw, and otherwise transfer funds to, from, and between such accounts by various methods, including checks, automatic clearing house ("ACH") and other electronic funds transfers, and direct deposits. All but one of the Prepetition Bank Accounts are maintained at Wells Fargo, a financially stable banking institution where the deposits are protected by various government backed deposit protection insurance programs.

53. The principal components of the Debtors' current consolidated cash management system are as follows:

(a)    The Debtors' Concentration Account. The Debtors' main concentration account is maintained at Wells Fargo, Account No. 4121193817 (the "Concentration Account"). All funds from the Debtors' Main Depository Account (defined below) are swept to the Concentration Account on a nightly basis. Funds are automatically transferred from the Concentration Account to other zero-balance accounts maintained by the Debtors as checks are presented on those accounts. In addition, the Debtors makes ACH transfers from the Concentration Account to fund of the Debtors' workers compensation obligations and sales and use taxes in certain states (California, Washington, Colorado, Illinois, Wisconsin and Nevada). The Debtors also authorize Advantage IQ, a third party processing company, to review the Debtors' utility bills, and the Debtors initiate ACH transfers from the Concentration Account to pay such bills after Advantage IQ completes its review. Pursuant to a master repurchase agreement between Claim Jumper and Well Fargo, excess funds in the Concentration Account automatically are invested each night in money market securities held in the same account. The

Debtors intend to discontinue this practice and leave funds in the Concentration Account overnight without further investment.

(b)     The Debtors' Main Depository Account and Sub-Accounts.  Cash and credit card proceeds from purchases made by the Debtors' customers at the various restaurant locations are deposited into individual sub-accounts for each restaurant location.  Cash deposits are typically made four to five times a week through the use of an armored car service.  Credit card receipts from VISA and MasterCard transactions typically are processed and deposited within a day, while American Express and Discover Card transactions take two to three days to process and deposit.  Fees charged by the credit card processing companies are debited from the credit card deposits to the sub-accounts on a monthly basis, except for American Express which deducts fees daily.  The deposits made into the individual restaurant sub-accounts are swept to the Debtors' main depository account at Wells Fargo, Account No. 4100061571 (the "Main Depository Account") and then on to the Main Concentration Account on a nightly basis.  The average daily amount of funds swept to the Concentration Account from the Main Depository Account is approximately $937,000.00.

(c)     The Debtors' Accounts Payable Accounts.  The Debtors' main account, from which they pay their general accounts payable obligations, is maintained at Wells Fargo, Account No. 4759036643 (the "Main A/P Account").  The Main A/P Account is a zero-balance account.  Checks that are drawn on this account are paid by automatic transfers in the appropriate amounts from the Concentration Account.  The Debtors use Ceridian Benefit Services, Inc. ("Ceridian") to write the paychecks drawn on the Payroll Account.

The Debtors also maintain a separate account at Wells Fargo, Account No. 4121193825 (the "Liquor A/P Account"), from which certain restaurant managers can write checks to pay for liquor purchases in order to comply with "cash-on-delivery" requirements

imposed in certain states (Washington, Illinois, Arizona and Oregon). There is a $5,000 limit on the amount of each check a manager may write, and any checks in excess of these amounts will not be honored by Wells Fargo. The Liquor A/P Account is a zero-balance account. Checks that are drawn on this account are paid by automatic transfers in the appropriate amounts from the Concentration Account.

(d)  The Debtors' Payroll Account. The Debtors maintain a separate account at Wells Fargo, Account No. 4375665056 (the "Payroll Account") from which the Debtors pay their payroll obligations, including certain related obligations such as payroll taxes, 401(k) contributions, and garnishments. The Payroll Account is in the name of CJM, which is the legal employer of all of the Debtors' employees. The Payroll Account is a zero-balance account. Checks that are drawn on, and direct deposits made from this account, are paid by automatic transfers in the appropriate amounts from the Concentration Account.

54.  Miscellaneous Accounts. The Debtors maintain a savings account at Wells Fargo, Account No. 4121093348. The savings account generally has a balance of approximately $2,000. Prior to the Petition Date, the Debtors also maintained a checking account with Cole Taylor Bank in Lombard, Illinois for employee check cashing purposes. The Debtors recently closed the Cole Taylor Bank account and had the balance of approximately $4,270 returned to them.

55.  Substantially disrupting these cash management procedures or creating an entirely new cash management system would inevitably have a deleterious effect on the Debtors' recordkeeping. It is essential, therefore, that the Debtors be permitted to continue to use their current Cash Management System.

56.  I believe the Cash Management System is similar in form to those commonly employed by corporate enterprises comparable to the Debtors in size and complexity.

57.     Given the corporate and financial structure of the Debtors, it would be impractical, if not impossible, for the Debtors to establish an entirely new system of accounts and a new cash management system for each separate legal entity.  For example, CJM is responsible for the payment of the Debtors' employee's wages and certain related obligations. However, as CJM does not itself operate the restaurants or generate any cash, it is dependent on CJR for access to and appropriate funding from the Main Concentration Account.  Furthermore, the delays that would result from opening new accounts and revising cash management procedures would disrupt the Debtors' business operations while pursuing these arrangements, at a time when vendors are closely scrutinizing the Debtors for deviations from "business as usual." Thus, under the circumstances, maintaining the Debtors' Cash Management System is both essential and in the best interests of their respective estates and creditors.  Of course, the Debtors will continue to maintain records with respect to transfers of cash, so that transactions can be ascertained, traced and recorded properly on applicable intercompany accounts.  Furthermore, preserving the "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with any substantial disruption in the Debtors' Cash Management System will facilitate the Debtors' efforts to effectuate its proposed sale of substantially all of its assets.

58.     In the ordinary course of business, the Debtors issue payments of certain worker's compensation obligations, utilities accounts payable and sales and use taxes in certain states by ACH transfers out of the Concentration Account.  In addition, the transfers between the various Prepetition Bank Accounts are made by electronic means.  If these practices are interrupted, particularly the payments to utility companies which are made twice weekly, it could result in a disruption of the Debtors' operations.  In the ordinary course of business, the Debtors automatically fund the Payroll Account from the Concentration Account for the cost of employee

DOCS_DE:163470.1
*4826-3023-1045v9*

payroll, tax withholdings, and other employee benefits. The Debtors provide their employees with paychecks written by Ceridian and drawn on the Payroll Account. If Ceridian is not authorized to continue this practice it could result in a disruption of the Debtors' employee payroll, which could lead to a significant erosion of the Debtors' employees' morale. Because these practices are carried out in the ordinary course of business, the Debtors do not believe their continuance requires Court approval. However, out of an abundance of caution the Debtors seek authority to continue these practices in order to avoid interference with the Debtors' ability to pay its employees' payroll benefits.

59. Prior to the Petition Date, the Debtors invested their cash with the primary goal of protecting their principal and the secondary goal of maximizing their principal's yield and liquidity. Specifically, excess funds in the Concentration Account were invested in an overseas short-term, money market investment account designed to yield a higher return on idle cash with little investment risk, and the funds were released back into the Concentration Account as cash on a daily basis. While the Debtors believe that this investment practice provided sufficient protection for their cash, the Debtors are mindful of the restrictions imposed by Section 345 of the Bankruptcy Code and the United States Trustee with respect to investments by a debtor-in-possession. Accordingly, shortly after the Petition Date, the Debtors will discontinued their prepetition investment practice, and instead will maintain excess funds in the Concentration Account maintained at Wells Fargo Bank.

60. During the ordinary course of the business, the Debtors maintain business relationships with each other, and as a result, there are intercompany claims that reflect intercompany receivables and payments made in the ordinary course of the Debtors' businesses (the "Intercompany Claims"). The most significant Intercompany Claims arise out of the relationship between CJR and its subsidiary CJM. CJM is the Debtor entity that actually

employs the Debtors' various employees (both corporate personnel and those working at the restaurants). CJM allows CJR to use the employees in connection with Claim Jumper's operation of the restaurants and overall management of the Debtors' business. In consideration for the labor services provided, and as part of the Cash Management System, when payroll checks drawn on the Payroll Account maintained in CJM's name are presented for payment, funds are automatically transferred from the Main Concentration Account to cover such checks. Thus, in the ordinary course of business, CJM regularly has an Intercompany Claim against CJR in an amount equal to the cost of the labor provided (e.g., wages, salaries, benefits, etc.).

61.    The Debtors maintain records of all fund transfers and can ascertain, trace and account for the foregoing transactions (the "Intercompany Transactions"). If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would disrupt the Debtors' business operations, ultimately to the detriment of all parties in interest.

62.    CJR and CJM engage in certain usual and customary business practices in the ordinary course of their businesses relating to the use and payment of the Debtors' employees (the "Intercompany Arrangements"). The Debtors believe that continued performance under the Intercompany Arrangements is not only important to the successful restructuring of the Debtors' entities, but is absolutely integral to ensure the Debtors' ability to operate their businesses as debtors-in-possession. Were the Debtors required to restructure their employment and payroll process at this critical time, aside from incurring unnecessary time delays and costs in appropriately modifying the system, the Debtors would be required to divert their attention and efforts from ensuring a smooth chapter 11 process. Moreover, the services provided under the Intercompany Arrangements are ordinary course type employee and payroll functions.

63. Based on the foregoing, I believe it is reasonable and appropriate for the Debtors to continue to use their prepetition cash management system.

**C. Motion of the Debtors for Entry of an Order: (I) Authorizing, But Not Requiring, The Debtors to Pay Prepetition (A)Wages, Salaries and Other Compensation, (B) Employee Medical and Similar Benefits, and (C) Reimbursable Employee Expenses; (II) Authorizing, But Not Requiring, the Debtors to Continue Their Existing Employee Benefit Plans and Programs, (III) Authorizing, But Not Requiring, the Debtors to Pay Prepetition Claims of Their Third Party Payroll Processors; and (IV) Authorizing and Requiring Banks and Other Financial Institutions to Pay All Checks and Electronic Payment Requests Made by the Debtors Related to the Foregoing**

**The Debtors Workforce**

64. The Debtors employ approximately 4,600 employees. The majority of the Debtors' employees, approximately 4,519 in all, work at one of the Debtors' 45 restaurant locations. The remaining 81 of the Debtors' employees are involved in field/district management or work at the corporate headquarters located in Irvine, California (the "Corporate Employees") and provide administrative support, including purchasing, human resources, financing and accounting services. None of the Debtors' employees are party to a collective bargaining agreement or associated with any union.

**The Debtors Compensation Procedures**

65. The Debtors pay their employees in arrears, on a bi-weekly basis, with direct deposits or checks issued on the 7th day after the close of each pay period. For the fiscal year ending December 29, 2009, the Debtors' average aggregate monthly payroll, including wages, salaries, and bonuses, was approximately $6.9 million.

66. The Petition Date occurred towards the end of the Debtors' normal bi-weekly payroll cycle. As a result, the next paychecks issued by the Debtors will include approximately $2.0 million in wages and salaries earned by the Debtors' employees before the Petition Date. Additionally, there may be a few employees who will have failed to cash

paychecks from pay periods concluding before the bankruptcy filing. In addition, as of the Petition Date, certain of the Debtors' employees are owed prepetition salary, including amounts accrued for vacation time or sick days, or hold uncashed prepetition paychecks, in excess of the $11,725 priority limit set forth in Bankruptcy Code section 507(a)(4). The Debtors do not intend to pay any employee any amounts for wages, salaries or accrued paid time off in excess of the individual priority limit at this time.

67. The Debtors also reimburse employees for certain reasonable out-of-pocket business expenses incurred in the ordinary course of business, or as may be required under employment contracts, such as necessary and authorized travel expenses, parking and automobile mileage, and relocation expenses. The Debtors pay or reimburse these expenses in the ordinary course and, by this Motion, request authority to continue doing so after the Petition Date. The Debtors typically pay or reimburse their employees approximately $30,000 in such expenses each month.

68. In addition, the Debtors regularly deduct amounts from the employees' paychecks for local, state and federal taxes, employee benefits and employee programs that the Debtors have historically sponsored. As of August 24, 2010, the Debtors held in trust approximately $831,000 in such payroll deductions that were deducted prepetition, and the Debtors believe that a substantially similar amount remains outstanding as of the Petition Date.

**The Debtors' Third Party Payroll Processor**

69. The Debtors use Ceridian to process their bi-weekly payroll. Ceridian issues invoices to the Debtors for its services with each bi-weekly payroll that it processes. As of the Petition Date, the Debtors owe Ceridian approximately $29,058.

**The Debtors' Employee Benefit Plans and Employee Programs**

70.     The Debtors provide employees, in the ordinary course of business, with a number of employee benefits, including, but not limited to (a) medical insurance, (b) life insurance, (c) workers' compensation payments, (d) vacation time and sick pay, (e) a savings plan, (f) long-term disability, and (g) miscellaneous employee benefits (collectively, the "Employee Benefit Programs"). In order to qualify for any of the Employee Benefit Programs, the hourly employees must have been employed for a minimum of six months and averaged 32 hours per week during that six month period. Salaried employees qualify for Employee Benefit Programs in the calendar month following their start date. The Debtors also offer an individual bonus plan to their store managers.

(a)     Medical Plan. Aetna provides medical insurance coverage to approximately 724 of the Debtors' active employees. This coverage costs the Debtors approximately $359,800 per month in premiums, which represents approximately 65% of the total coverage costs. As of August 24, 2010, there were no costs associated with the medical plan program that were outstanding and payable to Aetna by the Debtors.

(b)     Life Insurance. The Debtors provide group life insurance coverage through Aetna, at no cost to the employees, for (i) employees enrolled in their medical insurance plan and (ii) any employee in a management role, regardless of whether or not they are covered by the Debtors' medical insurance  Approximately 883 employees receive such coverage, which costs the Debtors approximately $30,500 annually. As of August 24, 2010, there were no costs associated with the group life insurance program outstanding and payable to Aetna.

(c)     Vacation and Sick Pay. The Debtors provide vacation time to salaried and certain hourly employees as a paid time-off benefit. Vacation time for the majority of the Debtors' employees accrues on a daily basis and, depending on the employee's position and length of employment, can range anywhere from one week to three weeks of vacation time per

DOCS_DE:163470.1
#4826-3023-1045v9

year.  The maximum accrued vacation time at any one time for these employees, however, is capped at 25 days, and such "capped" employee will no longer accrue additional vacation time until the employee uses some of its accrued vacation time.  In addition, there is a subset of the Debtors' hourly restaurant employees who accrue vacation time each year, which vacation time, if unused during the year, is paid out in cash to the employee on each anniversary of the employee's hiring date.  All managers and Corporate Employees also receive six paid sick days per year that are forfeited if not used during that year.

        (d)    <u>Employee Savings Plans</u>.  The Debtors maintain a 401(k) plan for the benefit of their employees.  The 401(k) plan provides for automatic pre-tax salary deductions of eligible compensation up to certain limits set by the Internal Revenue Code.  Approximately 361 employees participate in a 401(k) plan, and the approximate monthly amount collectively withheld from employees' paychecks is $38,000.  The Debtors do not provide any matching contributions under the 401(k) plan.  The Debtors, however, pay Nationwide Retirement Consulting Group an annual plan administration fee of $1,300 and a charge of $25 per participant.  In 2009, the Debtors paid $9,150 based on 366 participants.  The Debtors also pay the cost of a yearly audit of the 401(k) plan.  Squire Milner was paid $10,260 for the yearly audit of the 401(k) plan in 2009.

        (e)    <u>Long-Term Disability</u>.  The Debtors provide group long-term disability insurance through The Standard for (i) employees that are general managers and above at the store level and (ii) Corporate Employees that are directors and above.  A select group of lower level Corporate Employees has also been grandfathered into coverage.  Approximately 85 employees in total are covered by this program at an average yearly cost to the Debtors of approximately $400 per participant.

All of the Corporate Employees that are directors and above are also provided with individual long-term disability coverage through The Standard. A select group of lower level Corporate Employees has also been grandfathered into this benefit. Approximately 36 employees in total are covered by this program at an average yearly cost to the Debtors of $1,690.77 per participant.

(f)     _Additional Employee Benefits._  In addition to the employee benefits identified above, the Debtors offer their employees a number of voluntary benefits, in particular: (i) dental and vision insurance, (ii) short-term disability, (iii) critical illness insurance, (iv) accident insurance, (v) cancer insurance, and (vi) legal club membership. Aside from incidental administrative expenses, the Debtors do not incur any costs with such benefit programs, and all premiums are paid in full by the participating employee.

The Debtors also offer their employees certain incidental benefits. These include gas allowances for managers, complimentary meal cards, employee meals during work shifts, and uniform allowances.

(g)     _Bonus Plan._  The Debtors offer their store managers' performance based bonuses based on quarterly performance in specific target areas, including EBITDA and sales. The bonuses range in size from $1,100 to $4,000 per quarter depending on the manager's position. The bonus program has the potential for an annual targeted pay out of $2,317,000.

(h)     _Workers' Compensation._  The Debtors' primary workers' compensation insurance is provided through ARCH Insurance ("ARCH") and administered by Sedgwick CMS, a third party workers' compensation claims processor. The Debtors have a $350,000 deductible under the ARCH.   The Debtors' employees in Washington are covered by a zero deductible retrospective rating program ("Retro Program") administered by the Department of Labor &

Industries. The Retro Program is a pooling program provided through the Washington Restaurant Association.

The Debtors' overall claims paid under their Workers' Compensation Programs averaged approximately $1.6 million annually from 2006 through 2009, and approximately $1.6 in 2009. The Debtors expect the costs for 2010 to be approximately $1.9 million. As of August 24, 2010, approximately $3,004,000 in claims in reserve under the Workers' Compensation Programs were outstanding, and the Debtors believe that a substantially similar amount remains outstanding as of the Petition Date.

The Debtors are separately seeking authority to continue and pay the premiums and claims associated with the Debtors' workers' compensation programs (the "Workers' Compensation Program") in the Debtors' concurrently filed motion for authority to continue their existing insurance programs.

(i)     Severance Plan. Shortly before the Petition Date, the Debtors implemented a severance program for the hourly employees and managers at the Debtors' various restaurants. The severance plan provides: (i) a payment in the amount of $200, $300 or $400 based on years of service for all hourly employees upon completion of outstanding shifts and transfer or termination; (ii) one weeks' worth of severance pay for store managers that have been employed 5 years or less as a manager; (iii) two weeks' worth of severance pay for store manager that have been employed 6-10 years as a manager, and (iv) three weeks' worth of severance pay for store managers that have been employed more than 10 years. The Debtors estimate that the average severance payout at a particular restaurant if such restaurant was closed is approximately $14,000 to hourly employees and approximately $15,000 to Managers. The amount for store managers also would vary based on tenure, and number of layoffs vs. transfers

and demotions to hourly roles. The severance program does not apply to any of the Debtor's employees who are insiders or any of the Debtors' corporate employees.

The Debtors implemented the severance program in part because it will help alleviate some of the negative stigma and preserve the value of the Debtors' business during the contemplated restructuring and sale process. Specifically, the severance program will help maintain employee morale and provide some financial comfort to employees who otherwise may have left the Debtors immediately to seek what may be perceived as more stable employment. Clearly, if the Debtors' employees were to leave en masse, it would have a catastrophic impact on the Debtors' operations. The severance program helps minimize this risk.

In addition, as part of the contemplated sale process, the Debtors may need to close certain restaurants unless they obtain certain concessions from the Debtors' landlords. The discussions regarding those potential concessions will take some time, and it is critical that the restaurants that are in question continue to operate uninterrupted until such discussions have been concluded and a decision with respect to each restaurant has been made. In light of the foregoing, the Debtors believe the severance program is reasonable, appropriately tailored, and in the best interests of the Debtors' estates.

71. The Debtors request that the Court grant certain relief intended to minimize the disruption to the Debtors' workforce resulting from the commencement of these Chapter 11 Cases and thereby enhance the likelihood that the Debtors' employees will continue their employment during this uncertain period of financial restructuring. Specifically, the Debtors request that the Court authorize, but not require, them to:

- pay and honor prepetition claims for, among other things, wages, salaries, bonuses and other compensation, federal and state withholding taxes and other amounts withheld (e.g., garnishments, employees' share of insurance premiums, taxes and 401(k) contributions), employee health benefits, life insurance benefits, vacation and sick time, long-term disability coverage, store manager bonuses, workers' compensation benefits, severance and all other

employee benefits that the Debtors provide to the employees in the ordinary course of business;

- continue, in their discretion, the Employee Benefit Programs;

- pay all prepetition claims of the Debtors' third party payroll processor;

- pay certain reimbursable prepetition expenses that employees incurred on the Debtors' behalf in the scope of their employment; and

- pay all costs incident to the foregoing and any other benefits plans or programs provided by the Debtors to their employees.

72.     The Debtors represent that (i) they will not pay any amounts over $11,725 to any individual employee on account of prepetition wages, salaries or accrued vacation or sick days and (ii) they will not pay any amounts in excess of the estimated outstanding amounts for each category of prepetition claim identified herein without further order from this Court.

73.     I believe that the requested relief is essential to the continued operation of the Debtors' business and to the morale of their remaining employees, many of whom would suffer extreme personal hardship and financial difficulty were they not paid.  Indeed, I believe that without the requested relief, a significant number of their employees may voluntarily terminate their service with the Debtors and seek work elsewhere.  This would be devastating to the Debtors and would certainly hinder the Debtors' ability to continue operating their restaurant locations.  Accordingly, there can be no doubt that the Debtors must do their utmost to retain their current personnel, such as paying prepetition wages and benefits without interruption.

74.     The Debtors established the Employee Benefits Programs described above in order to attract and maintain their current workforce.  These programs are an important part of each employee's total compensation and provide the employees with certain protections that the employees would otherwise not be able to afford on their own.

75. Any delay in payment of accrued and outstanding wages and reimbursement requests, or any disruption in the Employee Benefit Programs would cause the Debtors' employees to suffer undue hardship. The Debtors' employees are absolutely critical in the running of the Debtors' restaurant locations and in the management of this process. Without these services, the Debtors' prospects for reorganization would be significantly hindered.

76. I also believe that a failure to continue making timely payments for Ceridian's payroll processing services, including any outstanding prepetition amounts, could result in Ceridian discontinuing such services. Absent Ceridian's services, there would be significant delays in the payment of employee's wages while the Debtors searched for and retained another payroll processor. Moreover, interruption in the timely payment of wages likely would cause significant negative consequences for the employees and a general decline in employee morale.

**D.    Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Remit and Pay Prepetition Sales, Use, and Franchise Taxes and Certain Other Government Fees and Charges and (II) Authorizing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Made Relating to the Foregoing**

77. In the ordinary course of business, the Debtors (i) collect sales taxes from their restaurant customers and incur on their own behalf taxes, including, but not limited to, use taxes, franchise taxes, personal property taxes and other taxes necessary to operate their businesses (collectively, the "Taxes"), and (ii) pay on their own behalf certain fees for licenses, permits, and other similar assessments (the "Fees"), including business licenses, liquor licenses, and health permits. The Debtors are required to remit the Taxes and Fees to the appropriate governmental entities either on a weekly, monthly, quarterly or annual basis. The principal Taxes and Fees collected or incurred by the Debtors are:

(j)    <u>Sales and Use Taxes</u>.  The Debtors collect sales taxes and/or incur use taxes in approximately 17 different municipalities, counties and states.  The aggregate monthly payment made by the Debtors for these types of taxes is approximately $2.05 million.

(k)    <u>Business Tax/Licenses</u>.  The Debtors are required to pay certain taxes or fees to obtain business licenses in the various municipalities or counties in which they operate their restaurants.  The Debtors' average annual cost to maintain these licenses is approximately $168,000.00.  The Debtors believe that substantially all of the taxes and fees associated with the licenses for the 2010 calendar year have been paid as of the Petition Date.

(l)    <u>Franchise Taxes</u>.  The Debtors incur certain franchise taxes in the various states in which they operate.  The Debtors average annual obligation for these franchise taxes is approximately $77,000.00.  As of the Petition Date, the Debtors believe there are no franchise taxes due and owing.

(m)    <u>Personal Property Taxes</u>.  Certain counties in which the Debtors operate restaurants require the payment of personal property taxes for certain furniture and equipment owned and/or operated by the Debtors.  These personal property taxes are generally paid on an annual or bi-annual basis.  The Debtors estimate that, as of the Petition Date, there is approximately $82,000 in unpaid personal property taxes that have accrued and are due, or will become due, to various taxing authorities.

(n)    <u>Health Permits</u>.  The Debtors are required to pay certain fees in order to obtain health permits in various municipalities and counties in which they operate restaurants.  The Debtors' average annual cost to maintain these health permits is approximately $49,000.  The Debtors believe that substantially all of the taxes and fees associated with the health permits for the 2010 calendar year have been paid as of the Petition Date.

(o)    Liquor Licenses.  In order to serve alcoholic beverages in their restaurants, the Debtors are required to obtain liquor licenses in various municipalities and counties in which they operate restaurants.  The Debtors' pay for these liquor licenses on an annual or quarterly basis.  The Debtors believe that substantially all of the fees associated with the liquor licenses for the 2010 calendar year or current quarter have been paid as of the Petition Date.

78.    The Debtors hereby request authority to pay the prepetition Taxes and Fees.  Although the Debtors' records reflect that they are current on all of their Taxes and Fees that were due and payable as of the Petition Date, the Debtors estimate that the total amount of Taxes and Fees that relate to the prepetition period, but either have not yet been billed to the Debtors or are not yet due will not exceed approximately $1.6 million.

79.    In all cases, the Debtors' failure to pay the Taxes and Fees would have a material adverse impact on their ability to operate in the ordinary course of business.  Any disputes that could impact their ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole.  Indeed, some, if not all, of the applicable governmental authorities may cause the Debtors to be audited if the Taxes and Fees are not paid immediately.  Such audits will unnecessarily divert the Debtors' attention away from the reorganization process.  And if the Debtors do not pay such amounts in a timely manner, the governmental authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay and pursue other remedies that will harm the estates.  In addition, some of these outstanding tax liabilities are for trust fund taxes that the Debtors have collected and hold in trust for the benefit of the applicable governmental authority.  Therefore, such funds do not constitute property of the estate and could not otherwise be used by the estates.  Finally, any prepetition amounts that are or will become due, but have not yet been paid to the relevant

governmental authorities because of the bankruptcy filings, represent a small fraction of the Debtors' total assets.

80.     As discussed in greater detail above, the Debtors are seeking an expedited sale of substantially all of their assets, which sale would be followed promptly by the filing of a plan of liquidation. Thus, in any event, the payment of the Taxes and Fees would be made in relatively short order, which is all the more reason to avoid unnecessary disruption to the Debtors' business.

81.     Furthermore, in certain states, applicable authorities could assert that the Debtors' officers and directors are held personally liable if the Debtors fail to meet the obligations imposed upon them to remit certain Taxes and Fees, such as sales taxes. To the extent such accrued Taxes or Fees of the Debtors were unpaid as of the Petition Date, the Debtors' officers and directors may be subject to lawsuits in certain jurisdictions during the pendency of these Chapter 11 Cases, even if the failure to pay such Taxes and Fees was not a result of any malfeasance on their part. Such potential lawsuits would prove extremely distracting for the Debtors, for the named officers and directors whose attention to the Debtors' reorganization process is required, and for this Court, which may be asked to entertain various motions seeking injunctions with respect to the potential state court actions. Moreover, it is likely that officers and directors would have indemnification rights over and against the Debtors, thereby directly implicating the assets of the estates. Therefore, I believe best interests of the Debtors' estates and the Debtors' prospects for reorganization to eliminate the possibility of the foregoing distractions.

**E.      Motion of the Debtors for Entry of an Order Under 11 U.S.C. Sections 105(A), 361, 362, 363 and 364 and Fed. R. Bankr. P. 6004(A) For an Order Authorizing: (I) Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Workers' Compensation, Liability, Property, and Other Insurance Programs, Including Payment of Policy**

**Premiums; and (II) Continuation of Insurance Premium Financing Programs**

82.     In connection with the operation of their businesses, the Debtors maintain workers' compensation, directors' and officers' liability, employment practices liability, fiduciary, crime, earthquake and flood, umbrella & excess liability and various other liability, property, and automobile insurance programs (collectively, the "Insurance Programs") through several different insurance carriers (the "Insurance Carriers") under insurance contracts listed on Exhibit A attached to the *Motion of the Debtors for Entry of an Order Under 11 U.S.C. Sections 105(A), 361, 362, 363 and 364 and Fed. R. Bankr. P. 6004(A) For an Order Authorizing: (I) Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Workers' Compensation, Liability, Property, and Other Insurance Programs, Including Payment of Policy Premiums; and (II) Continuation of Insurance Premium Financing Programs* (the "Insurance Motion"). To the extent the Debtors are parties to insurance contracts that were not listed on Exhibit A to the Insurance Motion, the Debtors will provide supplemental disclosure to creditors and the Court.

83.     In addition to the Insurance Programs listed on Exhibit A to the Insurance Motion, the Debtors maintain several other insurance policies and programs with respect to employee benefits, including health, dental, disability, and life insurance. These programs and policies are described Section C above. As set forth below, the Insurance Programs include coverage for, among other things, employees' losses related to employment, breach of officers' and directors' duties, personal injury torts, liability arising out of the operation of motor vehicles and various other first party property claims and third party liability claims.

84.     Pursuant to Bankruptcy Code sections 105(a) and 363(b) and Bankruptcy Rule 6004(a), the Debtors seek an order authorizing them to continue the Insurance Programs on an uninterrupted basis in accordance with the same practices and procedures as were in effect

before the Petition Date, and to pay all premiums, deductibles and all other obligations arising

under or in connection with the Insurance Programs (collectively, the "Insurance Obligations")

relating to the periods before and after the Petition Date, provided, however, that the aggregate

prepetition amounts paid to maintain the Insurance Programs shall not exceed $700,019.00

absent further express authorization by this Court. The Debtors also seek an order directing

Wells Fargo to honor, process, and pay, to the extent funds are available in their accounts, any

checks or wire transfer requests issued by the Debtors with respect to their Insurance

Obligations.

85.     In addition, pursuant to Bankruptcy Code sections 361, 362 and 363, the

Debtors request authority to continue, in the ordinary course of business, their insurance

premium financing programs and, to the extent necessary, to pay prepetition insurance premium

financing obligations owed by the Debtors on account of such programs.

86.     For the avoidance of doubt, the Debtors are not seeking authority to

implement or enter into any new insurance premium financing at this time. If the Debtors

determine that a new insurance premium financing arrangement should become necessary, the

Debtors separately will seek an order from Court approving and authorizing such new financing

arrangement.

### Workers' Compensation Program

87.     Under applicable law, the Debtors are required to maintain workers'

compensation policies and programs to provide their employees with workers' compensation

coverage for claims arising from or related to their employment with the Debtors (the "Workers'

Compensation Program"). The current Workers' Compensation Program is provided through

ARCH and insures losses arising during the period from July 1, 2010 through June 30, 2011.

The Workers' Compensation Program includes a $350,000 per occurrence deductible and the

deposit premium payable for such coverage is approximately $196,912 per year (the "Workers'

Compensation Premium"). This coverage is subject to audit. The Worker's Compensation

Program coverage was previously underwritten by ARCH and various other insurance providers,

including C.N.A. Hartford and Zurich. Under the prior insurance programs, the Debtors

continue to be billed annually, monthly and quarterly for all charges in incurred losses up to the

applicable per-occurrence deductible (ranging from $350,000 to $250,000). Total losses billed

in 2009 under the insurance programs were approximately $1.6 million. The claims under the

ARCH program are administered by Sedgwick CMS, the quarterly fee to administer the

Workers' Compensation Program is approximately $30,000.

### Directors and Officers Insurance and Employment Practices Liability Insurance

88.     As is common with large businesses of this kind, the Debtors maintain

insurance coverage for all of their directors and officers that covers, among other things, defense

costs, settlements, court awards and pre- and post-judgment interest arising from claims brought

by third parties alleging an insured is liable for an error, misstatement, misleading statement,

improper act, omission, neglect or breach of duty (the "D&O Programs"). The directors and

officers liability policy also includes coverage for employment practices liability claims. The

total limit of liability for these policies (primary and excess) is $15 million, consisting of $10

million in underlying coverage and $5 million in excess side A coverage. The aggregate annual

premium is $92,500. The current policy period is October 27, 2009 through April 27, 2011. The

Debtors also have a six-year tail on the D&O Programs that would cover any claims made

against the directors and officers that relates to the original time periods covered by the current

policy.

89.     The Debtors also maintain fiduciary liability insurance that insures the Debtors and its employees against claims made by 401k plan participants.  The policy is also in place to avoid having to purchase a separate bond.  The aggregate annual premium paid by the Debtors for fiduciary liability coverage is $1,000.  The current policy will expire on April 27, 2011.

### Liability, Automobile, Property and Umbrella Insurance Programs

90.     The Debtors maintain general liability insurance that insures premises liability, operations liability, personal injury and products liability (the "Liability Insurance Programs").  The aggregate annual premium for the Liability Insurance Programs coverage is $401,437 and the current policy expires on December 1, 2010.

91.     The Debtors maintain automobile insurance that insures automobile liability, medical payments, uninsured and underinsured motorists and physical damage to owned and hired vehicles (the "Automobile Insurance Programs").  The total aggregate annual premium paid by Debtors for automobile insurance coverage is included in the General Liability Policy and the current policy expires on December 1, 2010.

92.     The Debtors maintain property insurance that insures the Debtors' property for perils such as, but not limited to, fire, earthquake, flood and theft (the "Property Insurance Program").  The aggregate annual premium for the Property Insurance Program coverage is approximately $319,086 and the current policy expires on December 1, 2010.

93.     The Debtors maintain umbrella insurance that insures the Debtors for certain losses in excess of the coverage provided by the Debtors' primary policies (the "Umbrella Insurance Program").  The aggregate annual premium for the Umbrella Insurance Program coverage is approximately $111,683 and the current policy expires on December 1, 2010.

94.     The Debtors maintain "food-borne illness/trade-name restoration" insurance that insures the Debtors for damages to the Debtors' trade name resulting from the occurrence and public reaction to an accidental contamination, malicious tampering, or extortion attempt, and is intended to restore the Debtors' trade name following such an event (the "Food-Borne Illness Insurance Program"). The aggregate annual premium for the Food-Borne Illness Insurance Program is approximately $119,129 and the current policy expires on April 30, 2011.

### Debtors' Banks

95.     As part of the Debtors' cash management system, the Debtors maintain various bank accounts at Wells Fargo. The Debtors draw upon funds in their accounts at Wells Fargo to satisfy their obligations arising from the Insurance Programs.

### Insurance Premium Financing Programs

96.     As part of their existing cash management system, the Debtors regularly finance the payment of premiums on certain insurance policies, such as their D&O, Fiduciary, General Liability, Auto, Property and Foodborne Illness/Trade Name Restoration insurance programs, through the insurance premium finance companies AFCO Premium Acceptance, Inc. ("AFCO") and BankDirect Capital Finance ("BankDirect"). The Debtors have made all payments under the AFCO financing arrangements.

97.     The premium financing arrangement between CJR and BankDirect. Is memorialized in a premium financing agreement (the "Financing Agreement") and relates to the Debtors' Foodborne Illness Insurance Program. Pursuant to the Financing Agreement, after the Debtors' initial down payment of $29,895.00 on April 1, 2010, the Debtors financed a total of $90,659.20, which consists of $89,233.82 in premiums and an assessed finance charge in the amount of $1,425.38. The Financing Agreement requires 10 monthly payments to Bank Direct, each in the total amount of $9,065.92. As of the Petition Date, the Debtors have made four of the

monthly payments under the Financing Agreement and six monthly payments in the aggregate amount of $54,395.52 remain payable. The Debtors' obligations to BankDirect under the Financing Agreement are secured by certain sums payable to the Debtors under the Foodborne Illness Insurance Program covered by the Financing Agreement.

98.     Maintaining the Debtors' insurance coverage under the Insurance Programs is a crucial ordinary-course-of-business transaction. Authority to pay any prepetition amounts that may be due and owing under the Insurance Programs – to the extent the Debtors determine that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment of the coverage, benefits or proceeds provided under the Insurance Programs – is necessary to the Debtors' continued operation. In many instances, continuation of such coverage is required under the law and is imperative to the protection and preservation of the Debtors' most valuable assets. See 28 U.S.C. § 959(b) (chapter 11 debtor obligated under federal law to operate chapter 11 business according to the laws of the states where business and properties are located). In addition, the Debtors may need to renew or replace certain of their Insurance Programs in the upcoming months (including, for example, the General Liability Policy). The nonpayment of any premiums, deductibles, or related fees under one of the Insurance Programs could result in one or more of the Insurance Carriers increasing future insurance premiums, declining to renew their insurance policies or refusing to enter into new insurance agreements with the Debtors in the future. If the Insurance Programs lapse without renewal, the Debtors may be exposed to substantial liability for employees' worker's compensation claims, first party property claims, and third party liability claims to the detriment of all parties in interest. Moreover, the Insurance Programs are vital to the Debtors' ongoing operations. Pursuant to the terms of contracts and real property leases that the Debtors are parties to, as well as the guidelines established by the Office of the United States

DOCS_DE:163470.1
#4826-3023-1045v9

Trustee, the Debtors are obligated to remain current with respect to the bulk of their primary Insurance Programs. Additionally, the funding of the Workers' Compensation Program is a requirement under applicable law for the Debtors' ability to employ personnel for its businesses and operations. The retention of qualified and dedicated senior management is also linked to the continued effectiveness of the D&O Programs. Therefore, the continuation of the Insurance Programs and the payment of all prepetition and postpetition Insurance Obligations arising under the Insurance Programs are essential to the Debtors' businesses and to preserve value for all parties in interest.

99. The Debtors believe that the ordinary course maintenance of their insurance financing programs, including payment of all monthly obligations under the Financing Agreements is necessary and essential to the Debtors' operation of their businesses while they pursue the reorganization process, especially where, as here, the Debtors' failure to pay their monthly premium obligations to BankDirect could have detrimental consequences for the Debtors. Specifically, upon the Debtors' failure to pay the monthly premium obligations, the Financing Agreement permits BankDirect to immediately cancel any existing policies and collect sums payable to the Debtors under such policies. Because the Debtors are required to maintain insurance coverage during their Chapter 11 Cases, the cancellation of these policies would be particularly disastrous.

**F.** **Motion of the Debtors for Entry of an Order (I) Authorizing, But Not Directing The Debtors to (A) Honor and Pay Prepetition Obligations to Its Customers, (B) to Otherwise Continue Customer Programs and Practices in the Ordinary Course of Business, and (C) Pay the Prepetition Claims of Its Customer Programs Processors, and (IV) Authorizing Financial Institutions to Receive, Process, Honor and Pay All Checks and Electronic Payments Request Made Relating to the Foregoing**

100. The Debtors maintain several different customer programs in the ordinary course of their business which are designed to enhance satisfaction and thereby encourage the

continued patronage of the Debtors' customers. The customer programs consist of the following (collectively, the "Customer Programs"):

(a)     Gift Cards. The Debtors directly and indirectly sell gift cards to consumers which are eligible for redemption at the Debtors' restaurants. Annual gift card sales are approximately $10 million.

(b)     Bounceback Coupons. The Debtors periodically issue "bounceback" coupons to its customers. These coupons provide a discount to the customer upon his or her next visit to the Debtors' restaurants.

(c)     Incentive Programs. The Debtors regularly provide customers with a five to ten dollar card that can be redeemed at the Debtors' restaurants. These cards are generally provided to customers as a "thank you" or in consideration for participating in various research studies or surveys.

101.    The Debtors estimate that, as of the Petition Date, the total amount of the Debtors' prepetition obligations under the Customer Programs is approximately $9,800,000.

102.    The Debtors estimate that approximately $25,600,000 in sales are generated each year in transactions using the gift cards and other Customer Program incentives.

103.    Certain of the Customer Programs, including the gift cards and any other card issued in connection with incentive programs, are tracked and processed through third party processors, Paytronix Systems, Inc. ("Paytronix") and Open Payment Technologies, Inc. (the "Open Payment"). The Debtors pay Paytronix approximately $2,500 and Open Payment approximately $4,400 for these tracking and processing services on a monthly basis, and believe that a substantially similar amount remains owing to Paytronix and Open Payment as of the Petition Date.

104.    If the Debtor is prohibited from honoring prepetition obligations and maintaining the Customer Programs consistent with its past business practices, the restaurant customers will likely lose confidence in the Debtors' ability to reorganize.  In contrast, the Debtors strongly believe honoring the obligations under the Customer Programs will help to ensure the continued patronage of their customers, which is imperative to the ongoing operations and viability of Debtors' business.

105.    Furthermore, the damage from refusing to honor these obligations far exceeds the cost associated with honoring prepetition obligations and continuing these practices.  Indeed, the relief requested herein will protect the Debtors' goodwill during this critical time and enhance the Debtor' ability to generate revenue.

**G.**    **Motion of the Debtors and Debtors in Possession for an Order Authorizing Payment in the Ordinary Course of (I) Section 503(b)(9) Claims and (II) Certain Obligations for the Postpetition Delivery of Goods and Services**

106.    As the operators of a multi-unit restaurant chain, the Debtors, in the ordinary course of their business, receive various goods, including restaurant specialty items and food products on a daily basis.  Many of these goods are used by the Debtors in the preparation of the Debtors' various menu items that are served to the Debtors' customers later that same day.  Thus, the uninterrupted supply of these goods is essential to the Debtors' business operations.

107.    The Debtors believe that certain of the vendors and suppliers who delivered goods to the Debtors during the twenty-day period prior to the Petition Date but have not received payment for such goods (the "503(b)(9) Claimants") likely will seek the allowance and payment of those claims (the "503(b)(9) Claims") through individual motions to this Court.  The 503(b)(9) Claimants, the Debtors and other parties in interest will likely divert resources in these cases toward drafting, filing, prosecuting and defending such individual motions and related responses.

108.    Also in the ordinary course of the Debtors' business, numerous suppliers and service providers provide the Debtors with goods and services that are integral to the Debtors' business operations.  As of the Petition Date, the Debtors had outstanding prepetition purchase orders (collectively, the "Purchase Orders") with certain suppliers (collectively, the "Suppliers") for such goods and services.  The delivery of goods and services by the Suppliers is critical to the continued operation of the Debtors' businesses.

109.    As a result of the commencement of these Chapter 11 Cases, Suppliers may perceive a risk that they will be treated as prepetition general unsecured creditors for the cost of any shipments made or services provided pursuant to the Purchase Orders.  Consequently, the Suppliers may refuse to deliver such goods to the Debtors or provide such services to the Debtors unless the Debtors issue substitute postpetition purchase orders or provide other assurances of payment.  The revised postpetition purchase orders may include oppressive trade terms much more onerous on the Debtors than the terms in existing Purchase Orders.  Most troubling, some Suppliers may refuse to do business with the Debtors after the Petition Date due to the failure to honor the existing Purchase Orders, thereby forcing the Debtors to find alternate suppliers with only minimal resources.

110.    Moreover, issuing substitute purchase orders on a postpetition basis would be administratively burdensome, time-consuming, and counterproductive to the Debtors' reorganization.  Such a requirement imposed by the Suppliers – or other requests for assurance of payment – inevitably will lead to delays in the Debtors' receipt of goods and services, ultimately resulting in the disruption of the Debtors' businesses and hindering the Debtors' ability to continue operating their restaurants.  Any such disruption of the Debtors' restaurant operations would have a negative impact on the value of the Debtors' estates as a whole.

111.    Although the Debtors believe that they therefore may have the authority to make payment for any goods received postpetition (irrespective of the time the orders were first placed), confirmation of that authority is appropriate and necessary. The Debtors' relationship with their Suppliers is so essential that it is important to give the Suppliers the utmost reassurance that their valid claims will be given administrative expense priority status, and that they will continue to be paid by the Debtors in the ordinary course of business. Furthermore, any attempt by the Suppliers to interrupt goods in transit will create unanticipated supply shortages and restaurant closures detrimental to the going concern value of the Debtors' business.

112.    Absent the relief requested in this motion, the Debtors would be required to expend substantial time and resources convincing Suppliers of the Debtors' authority to make certain payments, reissuing Purchase Orders, and/or establishing the Debtors' right to retain the goods supplied under the Purchase Orders. The disruption in the supply of goods and services to the estate could significantly hinder the Debtors' operations and subject the Debtors to tremendous expense. Without the goods and services supplied through the Purchase Orders, the Debtors' would not be able to run their restaurants with the same offerings or service that they were able to provide before the Petition Date. Due to the nature of the Debtors' business, the continued patronage of the Debtors' customers, including the need to generate repeat visits, is critical to the ongoing operations of the Debtors' businesses. If the Debtors' customers were to stop patronizing the Debtors restaurants due to diminished offerings or declining service, the Debtors opportunity to preserve the value of their assets would be jeopardized.

**H.**     **Motion of the Debtors for Entry of an Order Pursuant to 11 U.S.C. § 546(c): (I) Establishing Procedures for Resolution of Reclamation Claims; and (II) Prohibiting Sellers of Goods from Reclaiming or Otherwise Interfering with Debtors' Possession of Certain Goods**

113.    In the ordinary course of their businesses, the Debtors purchase on credit from several vendors and suppliers (the "Sellers") various food products, including meat, poultry, seafood, produce and other staple food items (collectively, the "Goods"). The Debtors receive these Goods on a daily basis and, in many instances, use the Goods in the preparation of the Debtors' various menu items to be served to the Debtors' customers later during that same day. Accordingly, any disruption in the Debtors' receipt and use of the Goods could have disastrous consequences on the Debtors' business operations.

114.    As of the Petition Date, the Debtors were in possession of certain Goods that had been delivered to them, but for which they had not yet been invoiced or made payment to the Suppliers. Accordingly, as a result of the commencement of these Chapter 11 Cases, the Debtors may receive Reclamation Claims from various Sellers with respect to the Goods.

115.    Avoiding costly and distracting litigation relating to Reclamation Claims is critical at this state of the Debtors' Chapter 11 Cases. If the Debtors are unable to establish and implement uniform procedures to resolve the Reclamation Claims, they could be faced with the prospect of simultaneously defending numerous reclamation proceedings at a time when their efforts should be focused on preserving enterprise value.

116.    As described in greater detail in the Debtors' motion for authority to use cash collateral, filed concurrently herewith, the Debtors are party to a prepetition credit facility that is secured by liens on substantially all of the Debtors' assets. Under the express language of section 546(c)(1), the interests of the Debtors' lenders under the prepetition credit facility are superior to any reclamation claims. Thus, expending resources at this early stage to litigate reclamation claims, which may be valueless, would be a waste of the estates' resources. The Debtors' proposed procedures avoid such litigation and allow Sellers to establish the validity of

their Reclamation Claims, the characterization and recovery of which will be determined at a later date.

117. Given the volume of food product received daily by the Debtors, the Debtors anticipate that a number of sellers of Goods may make Reclamation Claims and otherwise seek to interfere with the Debtors' possession of Goods. These Goods are essential to the Debtors' business and preservation of the estates. Furthermore, absent the establishment of an orderly reclamation process, the Debtors' management would be diverted from important operational issues to deal with the Sellers' Reclamation Claims.

I. **Motion Pursuant to 11 U.S.C. §§ 105(a) and 541(d) for Order Setting Procedures for Treatment of Claims Arising Under the Packers and Stockyards Act of 1921 and the Perishable Agricultural Commodities Act of 1930**

118. As the operators of a multi-unit restaurant chain, the Debtors purchase a variety of consumable goods essential for the operations of their restaurants. In many instances, the consumable goods that are received daily by the Debtors are used in the preparation of the various menu items to be served later during that same day. These consumable goods include among other things, beef, poultry, dairy products, produce and general merchandise purchased from a diverse range of vendors, including sellers of livestock and agricultural growers. The Debtors' purchase of certain of these consumable goods likely is subject to the requirements of PSA or PACA. As a result, the Debtors anticipate that a significant number of their vendors may file notices to preserve and assert claims under PSA/PACA (the "PSA/PACA Claims").

119. As of the Petition Date, the Debtors estimate that their PSA/PACA Claimants have prepetition claims in an amount as great as $1,025,000.

120. It is essential to the operations of the Debtors that the flow of Perishable Commodities and other goods and merchandise used in the day-to-day operations of the Debtors'

business continues unimpeded. Moreover, preservation of Debtors' relationships with the suppliers of these goods is particularly critical due to the nature of the Debtors' operations in the highly competitive restaurant industries. If the Debtors do not promptly honor and pay the PSA/PACA Claims in the ordinary course of business, they run the risk that the PSA/PACA Claimants will move immediately to enforce their rights through adversary proceedings and emergency relief requests of the Court. In such event, the Debtors could be forced to spend significant time litigating the PSA/PACA Claims, thereby preventing the Debtors' officers and professionals from concentrating on the far more important tasks of operating the Debtors' business while in bankruptcy. The failure to pay the PSA/PACA Claims could also alienate the PSA/PACA vendors on whom the Debtors rely to provide the basic food products necessary for the operation of their business. The Debtors cannot afford to aggrieve their PSA/PACA vendors, and thereby risk losing favorable credit terms, or possibly their business altogether, at this critical stage of the reorganization process. Accordingly, it is the Debtors' business judgment that prompt satisfaction of valid PSA/PACA Claims will best promote the Debtors' rehabilitation.

J.      **Motion of the Debtors for Entry of Interim and Final Orders under 11 U.S.C. §§ 105(A) and 366: (I) Prohibiting Utilities from Discontinuing, Altering or Refusing Service; (II) Establishing Procedures for Determining Adequate Assurances of Payment; and (III) Establishing Procedures for the Utilities to Opt Out of the Debtors' Proposed Procedures for Adequate Assurance**

121.    In the operation of their restaurants, the Debtors incur utility expenses for water, sewer service, electricity, natural gas, waste disposal, local and long-distance telephone service, cell phone service, cable television and internet service in the ordinary course of business. On average, the Debtors spend approximately $972,477.50 each month on utility costs. These utility services are provided by approximately 127 utility providers (the "Utility Providers"). Although the Debtors believe that Exhibit A to the *Motion of the Debtors for Entry of Interim and Final Orders under 11 U.S.C. §§ 105(A) and 366: (I) Prohibiting Utilities from*

*Discontinuing, Altering or Refusing Service; (II) Establishing Procedures for Determining*

*Adequate Assurances of Payment; and (III) Establishing Procedures for the Utilities to Opt Out*

*of the Debtors' Proposed Procedures for Adequate Assurance* lists all entities that could qualify

as a Utility Provider, the Debtors reserve the right, without further order of the Court, to

supplement the list if any Utility Provider has been omitted.

      122.    Uninterrupted utility services are essential to the ongoing operations of the

Debtors' restaurants and, therefore, vital to the success of the Debtors' reorganization. Should

the Utility Providers refuse or discontinue service, even for a brief period, the Debtors' business

operations would be severely disrupted. In particular, such discontinuation would irreparably

disrupt the Debtors' ability to operate their restaurant facilities, negatively affecting customers,

cash flow and, ultimately, value and creditor recoveries.

      123.    For example, without electricity, natural gas and water services, the

Debtors would not be able to operate various equipment in their restaurants' kitchens, nor

provide lighting, air conditioning or heating services for their restaurant facilities. Similarly, the

timely and proper disposal of the waste that accumulates at the Debtors' restaurants is critical to

ensure compliance with applicable health codes and keep the restaurants open. These are just a

few examples of how an interruption of utility services would negatively impact the Debtors'

business operations, customer relationships, revenue and profits, seriously jeopardizing the

Debtors' reorganization efforts. It is therefore critical that utility services continue uninterrupted.

      124.    The Debtors propose providing adequate assurance to each Utility

Provider by making a deposit equal to two (2) weeks of utility service, calculated as a historical

average over the past twelve (12) months ("Adequate Assurance Deposit"), to each such Utility

Provider who requests such a deposit in writing (the "Adequate Assurance Request"), provided

that (i) such requesting Utility Provider does not already hold a deposit equal to or greater than

two (2) weeks of utility services, (ii) such Utility Provider is not currently paid in advance for its services and (iii) such Utility Provider has not already entered into an adequate assurance agreement with one or more of the Debtors in the period immediately preceding the Petition Date (the "Adequate Assurance Procedures").

125.    As a condition of requesting and accepting an Adequate Assurance Deposit, the requesting Utility Provider shall be deemed to have stipulated that, upon payment of the Adequate Assurance Deposit, the Adequate Assurance Deposit constitutes adequate assurance of future payment to such Utility Provider within the meaning of section 366 of the Bankruptcy Code, and shall further be deemed to have waived any right to seek additional adequate assurance during the course of these Chapter 11 Cases.  Finally, the Utility Provider will be required to return the Adequate Assurance Deposit to the Debtors' estates within fifteen (15) days of the earlier to occur of (i) the consummation of any sale of all or substantially all of the Debtors' assets or (ii) any confirmed plan of reorganization or plan of liquidation.

126.    The Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for past and future utility services in the ordinary course of business (collectively, the "Proposed Adequate Assurance") from cash collateral, constitutes sufficient adequate assurance to the Utility Providers.

127.    In most cases, the Debtors believe that the Utility Providers will conclude that any deposit in excess of the proposed Adequate Assurance Deposit is unnecessary.  The Debtors have a good relationship with all of the Utility Providers, having a long history of timely payments to these entities.  In fact, none of the Debtors' Utility Providers currently holds a security deposit in normal course, except for two utilities that in the aggregate hold deposits of less than $62,000.

128.    The Debtors believe that most, if not all, of their Utility Providers have adequate assurance of payment without any additional adequate assurance payment. The Debtors' intended use of cash collateral will enable them to pay their operating costs, including utility costs, as they come due. Moreover, the Debtors have a powerful incentive to stay current on their utility obligations because of their significant reliance on utility services for the operation of their restaurant facilities. Without utility services, the Debtors will be unable to operate the restaurants at all.

129.    The proposed procedures are necessary for the Debtors to carry out their reorganization efforts. If the Court does not approve the proposed procedures, the Debtors could be forced to address numerous requests by their Utility Providers in a disorganized manner at a critical point in their reorganization. Moreover, the Debtors could be blindsided by a Utility Provider unilaterally deciding — on the thirty-first (31st) day — that it is not adequately protected and discontinuing service or making an exorbitant demand for payment to continue service. As set forth above, discontinuation of service, particularly electricity, natural gas, water, and waste disposal services, essentially would halt the Debtors' operations indefinitely, putting the Debtors' reorganization efforts in extreme jeopardy.

130.    I believe the Proposed Adequate Assurance and other relief requested in the Utilities Motion are in the best interests of the Debtors and their estates and will enable the Debtors to continue to operate their businesses in chapter 11 without interruption.

**K.      Motion of the Debtors for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 and Federal Rule of Bankruptcy Procedure 4001: (I) Authorizing Debtors' Use of Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; and (III) Scheduling a Final Hearing**

131.    As discussed in greater detail above, the Debtors' significantly overleveraged financial condition and recent overexpansion, and other economic forces beyond the Debtors' control—including a general decline in dining sales concomitant with the recent

national economic recession—have combined to place significant stress on the Debtors' liquidity. As of the Petition Date, the Debtors had cash on hand of approximately $3.3 million.

132.    The Debtors believe that their only viable restructuring option and means of preserving value is through an expedited going-concern asset sale through these Chapter 11 Cases. The Debtors further believe that their existing cash on hand, along with future cash flows from continued operations, should be sufficient to pay for the Debtors' operating costs and administrative expenses in bankruptcy provided that the Debtors are able to effectuate an asset sale during the next 60 to 75 days.

133.    Therefore, in order to effectuate an expedited sale and preserve as much of the value of their business as possible, I believe the Debtors must have access to the existing and future cash collateral of the Prepetition Secured Parties.

134.    Prior to the Petition Date, the Debtors and the Prepetition Secured Parties negotiated the terms and conditions for the consensual use of the Prepetition Secured Parties' cash collateral, which terms and conditions are summarized in the Cash Collateral Motion and more fully set forth in the proposed Cash Collateral Orders.

## III.    Bid Procedures and Sale Motions

**A.    Debtors' Motion for Entry of an Order (A) Approving Bid Procedures Relating to the Sale of the Debtors' Assets, (B) Approving Bid Protections for Stalking Horse Purchaser, (C) Scheduling a Hearing to Consider the Sale, (D) Approving the Form and Manner of Notices of Sale by Auction, (E) Establishing Procedures for Noticing Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases and Determining Cure Amounts, and (F) Granting Related Relief;**

**and**

**Debtors' Motion for an Order: (I) Approving Asset Purchase Agreement and Authorizing the sale of the Debtors' Assets Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (IV) Granting Related Relief**

135.     As discussed in greater detail herein, the Debtors believe that a prompt sale of their assets is necessary to preserve the value of the Debtors' business. The Debtors currently do not have sufficient cash resources to operate their businesses and service their existing debt obligations. The Debtors also are in default under each of their principal prepetition credit facilities and do not have a forbearance agreement for the prepetition senior secured lenders. In addition, the Debtors are informed that their prepetition secured lenders, who have liens on substantially all of the Debtors' assets including the Debtors' cash, are severely undersecured and unwilling to fund the Debtors through a traditional plan of reorganization process. Furthermore, the Debtors believe that if a sale is not completed before the upcoming holiday season, and, consequently, a buyer does not realize the increased revenues during that period, the sale price achieved will significantly decline.

136.     Accordingly, on September 10, 2010, after a lengthy and robust prepetition marketing process, the Debtors entered into the Agreement with the Buyer, pursuant to which the Buyer will purchase substantially all of the Debtors' Assets. The terms of the Purchaser's offer to purchase the Assets are set forth in the Agreement attached as an exhibit to the Sale Motion, and are summarized below. The description below only summarizes certain provisions of the Agreement, and the terms of the Agreement control in the event of any inconsistency.

**Purchase Price:**     The aggregate consideration for the sale and transfer of the Assets shall be (i) cash in the amount of $24.5 million and (ii) the assumption of the Assumed Obligations (as defined in the Agreement), which includes (A) the assumption of certain Assumed Seller Obligations (as defined in the Agreement) and (B) the assumption of up to $23.3 million of Assumed Seller Pre-Closing Obligations (as defined in the Agreement) and (C) up to $5 million in cash collateral assumption obligations. APA § 1.4(a).

| | |
|---|---|
| **Transferred Assets:** | On the terms and subject to the conditions set forth in the Agreement, at the Closing, but effective as of the Effective Time (as defined in the Agreement), the Debtors shall jointly and severally sell, transfer, assign, grant, and convey to Buyer, and Buyer shall acquire and purchase from the Debtors, all right, title and interest in, to and under (in each case free and clear of any and all liens, claims, interests or encumbrances, in each case pursuant to section 363(f) of the Bankruptcy Code), whether arising prior to or subsequent to the Petition Date, the Transferred Assets (as set forth and defined in the definition of "Transferred Assets" in the Agreement). APA § 1.1. |
| **Excluded Assets:** | The Debtors shall retain and be responsible for, and Buyer shall not acquire or assume, (i) the Excluded Assets (as set forth and defined in the definition of "Excluded Assets" in the Agreement) and (ii) the Retained Obligations (as set forth and defined in the definition of "Retained Obligations" in the Agreement), whether a claim in respect thereto is brought on, before, or after the closing date. APA § 1.3. |
| **Contracts to be Assumed and Assigned:** | The Agreement provides for the Debtor to assume and assign the Assigned Contracts (as set forth and defined in the definition of "Assigned Contracts" in the Agreement) to the Buyer as part of the Buyer's acquisition of the Transferred Assets. APA §§ 1.2, 7.2. |
| **Closing Date:** | The "Closing Date" shall be the third business day following the date on which the conditions set forth in Article V of the Agreement have been satisfied or waived. APA § 1.6. |
| **Representations and Warranties:** | The Agreement contains standard representations and warranties of the parties including as set forth in Articles II and III of the Agreement. |

137.    The Debtors believe that the sale of the Assets as a going concern to the Purchaser, or to a higher and better bidder at the Auction, is far preferable to a piecemeal liquidation of its assets. In addition, as a result of the Debtors' extensive prepetition marketing efforts that spanned nearly a year and a half, the Debtors believe that the Purchaser's offer for the Assets is fair and reasonable given the Debtors' current circumstances, and that such offer or any higher and better offer obtained through the proposed Bid Procedures and Auction provides

maximum value to the Debtor under the current circumstances. The Debtors also will reduce their administrative costs by the Sale of the Assets, while realizing maximum value for the assets of the Debtors through a going concern Sale.

138.  Black Canyon submitted the highest and best bid of the four bids received most recently by the Debtors. In addition to these economic advantages, the Agreement has the additional corollary benefit of resolving any disputes regarding the Debtors' corporate governance. This will facilitate an orderly sale process and the prompt exit of business operations from bankruptcy. These factors underscored the Debtors' determination that a sale of the Assets to the Buyer represented both the highest and best offer available to the Debtors as of the Petition Date.

139.  In connection with the execution of the Agreement, the Buyer also delivered to the Debtors a binding financing commitment from Private Capital Partners LLC ("Private Capital") with respect to the Buyer and the Agreement (the "Equity Commitment Letter"). The Equity Commitment Letter, among other things, obligates Private Capital to contribute an aggregate of $30 million to the Buyer contemporaneously with the Closing provided that there has been no termination of the Agreement and is valid and irrevocable until the later of Closing or the termination of the Agreement, subject to certain conditions. Private Capital and the parties to the Equity Commitment Letter own and manage a group of investment funds with more than $2 billion in assets under their control. The Equity Commitment Letter, thus, provides assurance to the Debtors that the Buyer will have the financial wherewithal to close on the proposed Sale transaction.

140.  Moreover, given the limited funding available to the Debtors and the deadlines set forth in the Agreement, the Debtors are under significant pressure to consummate the sale of the Assets as quickly possible. Nevertheless, the Debtors are mindful of their

DOCS_DE:163470.1
#4826-3023-1045v9

fiduciary duties and want to ensure that they are able to maximize value by providing sufficient notice of the Auction and Sale process. Accordingly, the Debtors are requesting that the Court schedule the Auction for no later than October 28, 2010 and the Sale Hearing for no later than November 2, 2010. The Debtors believe that this scheduling will provide ample notice of the Auction and sufficient time for any potential bidders to conduct diligence regarding the Assets and, if interested in participating at the auction, to submit a Qualified Bid.

141.    Accordingly, for the reasons stated above concerning the Debtors' liquidity constraints, the existing defaults under the Debtors prepetition credit facilities and the risk of the Debtors' principal creditors exercising remedies, and in light of the obvious benefits to the estates, the Debtors' Board of Managers determined, in the exercise of its business judgment, to consummate the proposal submitted by the Purchaser under the Agreement or, if applicable, another bidder in the event that the Debtors receive a higher and better bid to the one proposed by the Purchaser.

## The Bid Protections

142.    The Agreement also provides that the Buyer will be entitled to a break-up fee (the "Break-Up Fee") in the amount of $1,000,000 and a reimbursement of its reasonable out-of-pocket expenses up to $500,000, an amount that the Debtors acknowledge Buyer already has incurred (the "Expense Reimbursement" and, collectively with the Break-Up Fee, the "Bid Protection Amount"). In the event that the Buyer terminates the Agreement for any reason other than as a result of a breach by the Buyer, the Debtors will be obligated to pay the Expense Reimbursement. In the event that (i) the Debtors receive one or more Qualified Bids (other than the Buyer's stalking horse bid) and conduct the Auction, and (ii) either (a) the Buyer does not make an overbid at the Auction, or (b) the Debtors select a bidder other than the Buyer to be the highest and best bid at the Auction, then the Debtors will be obligated to pay the Buyer the Bid

Protection Amount; provided, however, that in the event that the Buyer is the Successful Bidder at the Auction or otherwise closes on an acquisition of the Assets, it shall no be entitled to payment of the Bid Protection Amount.

143.     The Break-Up Fee is approximately 1.9% of the total consideration[2] of approximately $52.8 million to be provided to the Debtors' estates under the Agreement under the Agreement, prior to any adjustments thereto. The Debtors are informed and believe that this percentage is well within the range of termination fees approved by bankruptcy courts in chapter 11 cases.

144.     The Debtors believe the Break-Up Fee, the Expense Reimbursement, and the Bid Procedures are reasonably calculated to encourage a purchaser to submit a final bid within the range of reasonably anticipated values. The Buyer will be the stalking horse for competitive bids, perhaps leading to further competition and the establishment of a baseline against which higher or otherwise better offers can be measured.

145.     Specifically, the Debtors believe that the agreement to pay the Bid Protection Amount was and remains critical to the Sale process. Indeed, the payment of the Break-Up Fee and the Expense Reimbursement under the terms of the Agreement, and the establishment of the Bid Procedures, were reasonable and necessary to induce a purchaser to enter into the transactions encompassed by the Agreement and thus to enable the Debtors to obtain the highest and best price possible for the Assets. Each of the entities that submitted a stalking horse bid, including Black Canyon, insisted on the inclusion of some form of bid protections in its proposed purchase agreement. Without the Bid Protection Amount or similar

---

[2] Cash consideration of $29.5 million plus the assumption of up to $23.3 million in liabilities.

bid protections, the Debtors believe they would have been unable to convince any entity to serve as a stalking horse bidder.

146.    Thus, the Bid Protection Amount was integral to the execution of the Agreement and putting the Debtors in a position to file these chapter 11 cases and pursue an auction process that would maximize the consideration received for the sale of the Assets. Furthermore, if the Bid Protection Amount is not approved, the Buyer will have the ability to walk away from the Agreement. The uncertainty that would be created in that scenario could have potentially disastrous consequences to the Debtors, their estates and their creditors.

147.    In addition, the Bid Protection Amount also will compensate the Buyer for serving as the stalking horse bidder whose bid will be subject to higher or better offers, the Debtors seek approval of the Break-Up Fee and Expense Reimbursement in accordance with the terms of the Agreement. In exchange for providing the benefits to the Debtors' estates of having a stalking horse bidder by virtue of the Agreement with the Buyer, the Bid Protections mitigate the risk to the Buyer that a third-party offer may ultimately be accepted.

148.    The Debtors believe that bidding incentives also encourage a potential purchaser to invest the requisite time, money and effort to negotiate with the Debtors and perform the necessary due diligence attendant to the acquisition of the Debtors' assets, despite the inherent risks and uncertainties of the chapter 11 process. Furthermore, the Debtors believe Break-Up Fee and Expense Reimbursement already have encouraged competitive bidding, in that the Buyer would not have entered into the Agreement without these provisions.

149.    Finally, the Debtors believe that the Bid Procedures are fair and appropriate procedures reasonably intended to encourage competitive bidding, and the Break-Up Fee and the Expense Reimbursement will permit the Debtors to insist that competing bids for the

Assets made in accordance with the Bid Procedures be materially higher or otherwise better than the Agreement (or competing agreement), which is a clear benefit to the Debtors' estate.

### Assumption and Assignment of Executory Contracts and Unexpired Leases

150.    At Closing, the Debtors intend to assume and assign to the Successful Bidder certain executory contracts and unexpired leases identified on certain schedules to the Agreement (i.e. the Assigned Contracts).[3] The Debtors shall file a list of the Assigned Contracts, and the final proposed cure amounts associated therewith, with the Bankruptcy Court. The Debtors also propose to serve such notice upon each counterparty to the Assigned Contracts. The Debtors shall be responsible for the payment of all cure amounts, provided that, pursuant to the Agreement, the Buyer shall be responsible for one half of the final cure amounts due in connection with the assumption and assignment of the Debtors' leases of real property in an amount not to exceed $800,000.

151.    The Debtors further believe that the Equity Commitment Letter provided by Private Capital provides sufficient evidence that the Buyer will be sufficiently capitalized and thus will be able to honor its obligations under the Assigned Contracts in the ordinary course as they come due after the closing of the Sale. The Debtors therefore believe the Buyer has provided "adequate assurance of future performance" to the counterparties to the Assigned Contracts. If necessary, the Buyer or the other Successful Bidder shall provide additional evidence of its ability to provide adequate assurances to counterparties at the Sale Hearing.

---

[3] The inclusion of any agreement in the list of Assigned Contracts does not constitute an admission by the Debtor that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtor expressly reserves the right to challenge the status of any agreement included in the list of Assigned Contract up until the time of the Sale Hearing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 10th day of September 2010, at Los Altos, California.

_____

William G. Taves
Chief Financial Officer
Claim Jumper Restaurants, LLC