| | |
|---|---|
| In re: | Chapter 11 |
| CLAIM JUMPER RESTAURANTS, LLC., et al., | Case No. 10-12189 (KG) |
| Debtors. | Re: Docket No. 355 |
| | Hearing Date: TBD |
| | Objection Deadline: Nov. 29, 2010 at 4:00 p.m. |

## OBJECTION OF BLACK CANYON CAPITAL LLC AND PRIVATE CAPITAL PARTNERS TO JOINT MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR APPROVAL OF STIPULATION AND ORDER AMONG THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND WELLS FARGO BANK, NATIONAL ASSOCIATION, AS PREPETITION AGENT AND DIP AGENT

Black Canyon Capital, LLC and Private Capital Partners (collectively, "Black Canyon") hereby object to the Joint Motion of Claim Jumper Restaurants, LLC ("CJR"), Claim Jumper Management, LLC ("CJM" and, collectively with CJR, the "Debtors") and the Official Committee of Unsecured Creditors for Approval of Stipulation and Order (the "Stipulation") Among the Debtors, the Official Committee of Unsecured Creditors and Wells Fargo Bank, National Association, as Prepetition Agent and DIP Agent (the "Motion"). In support of this Objection, Black Canyon respectfully represents as follows:

### SUMMARY

1.  Black Canyon is the single largest unsecured creditor in these chapter 11 cases, with scheduled claims against each of the Debtors totaling over $112,000,000, approximately 88% of all scheduled general unsecured claims of CJR and 99% of all scheduled unsecured claims of CJM. Black Canyon is a third party creditor and is not an insider or affiliate of the Debtors. The Debtors are ultimately owned by affiliates of Leonard Green Partners ("LGP"), which are not affiliated in any way with Black Canyon. The Boards of the Debtors

were not appointed by Black Canyon, but were instead appointed by LGP and/or the Debtors' senior secured creditor.

2. To put the size of the Black Canyon's claim in perspective, the members of the Official Committee of Unsecured Creditors' (the "Committee") hold general unsecured claims scheduled in the amount of approximately $6,437,559 and against only CJR. Thus, the claim of Black Canyon represents the lion's share of the constituency represented by the Committee. Black Canyon was also approved as the stalking horse bidder in the Debtors' successful auction of substantially all estate assets. Solely as a result of its decision to submit a bid for the assets in the auction, Black Canyon did not seek appointment to the Committee. Although Black Canyon was not selected as the winning bid at the auction, its efforts to act as a stalking horse nevertheless contributed to the auction's successful outcome.

3. As detailed below, a General Unsecured Creditors' Trust (the "GUC Trust") has already been established by the Court for the benefit of all unsecured creditors, with the Debtors' secured lender, Wells Fargo Bank, National Association (the "Bank"), having (i) agreed that such funds are not to be treated as its collateral and (ii) waived any right to any distribution on account thereof on its deficiency claim. Despite the fact that the Bank already agreed that it has no property interest in the GUC Trust or any right to participate in distributions based on its deficiency claim, the proponents of the Motion are attempting to exclude Black Canyon, the largest unsecured creditor of these estates, from receiving a distribution from the GUC Trust for the benefit of the minority holders of unsecured claims of the type that control the Committee.

4. The Motion is defective and should be denied. Indeed, the Motion to approve these modifications to the existing GUC Trust fails to identify any legitimate reason for

2

either the estates or the Committee to bargain away Black Canyon's right to receive distributions from the GUC Trust on accounts of its unsecured claim. Moreover, while under some circumstances, a senior creditor may be permitted to "gift" its recovery to all general unsecured creditors, the proposed modification to the terms of the GUC Trust as originally established by the Final DIP Order (as defined below) does not so qualify.

5.     While the Stipulation purports to preserve Black Canyon's objections for a future date, such reservation does not solve the problems raised in this Objection. If all objections really are preserved, there is no reason for the Court to approve the Stipulation; such would be a mere advisory opinion. Indeed, the movants fail to explain the purpose of seeking Court approval of their putative agreement.

6.     In fact, approval of the Stipulation by the Court would inherently prejudice Black Canyon. As a preliminary matter, the movants seek approval of their agreement without any effort to satisfy the applicable legal standards needed to obtain Court approval of a settlement, nor could they. At a minimum, the Committee seeks the right to use and/or compromise estate claims and assets to obtain and/or pursue a redistribution scheme among its unsecured creditor constituents that can only benefit the small minority of claims at the expense of roughly 90 percent of the unsecured claims class. That effort is not appropriate under either applicable law or the terms of the Note Purchase Agreement (as defined below), and can only lead to a dissipation of the GUC Trust. Indeed, the effort to obtain assignment of and enforce the subordination for the benefit of the minority of unsecured claims cannot succeed and would merely waste estate resources. It is no more fair and equitable for a Committee dominated by trade to obtain assignment of a right to use for their benefit against the bondholders, than it would be for a Committee dominated by bondholders to obtain assignment of the Bank's

collateral interest to secure an advantage for themselves only over trade creditors.[1] The Stipulation also inherently contradicts the existing Final DIP Order, despite its protests to the contrary.

7. Moreover, Black Canyon believes that the Stipulation interferes with its subrogation rights under the Note Purchase Agreement. No third party should be insulated from potential claims as a result of entry into the Stipulation through Court approval.[2]

8. For these reasons and the reasons set forth below, Black Canyon submits that the Stipulation should not be approved by the Court.[3]

## BACKGROUND

### The Note Purchase Agreement

9. Black Canyon holds over $112,000,000 in scheduled unsecured claims based upon a Note Purchase Agreement dated October 28, 2005 (the "Note Purchase Agreement").[4] These claims are *pari passu* with all other unsecured claims held by the trade,

---

[1] To be clear, Black Canyon does not assert that the Committee or its representatives have acted with malice or unethically. Rather, Black Canyon believes the Committee has simply lost sight of the fact that Black Canyon is its largest constituent as a result of its prior position as the stalking horse bidder. As a result, the Committee has become unrepresentative of the major claims that form its core constituency. In light of the results of the auction, Black Canyon is not the buyer of the Debtors' assets, but is instead simply its largest creditor.

[2] Black Canyon also believes that the effort to assign the subordination rights to a third party interferes with its subrogation rights and is impermissible under the Note Purchase Agreement. Black Canyon reserves the right to pursue any such claim against third parties. Furthermore, Black Canyon reserves all other rights under the prepetition Exclusivity Agreement between itself and various third parties including the senior lenders and the Debtors. Black Canyon has not released any claims it may have against any third parties (whether as a result of the proposed stipulation, the Exclusivity Agreement or any other basis). All such third party claims are expressly reserved.

[3] Notwithstanding the strengths of Black Canyon's arguments in opposition to the Stipulation, the fees and costs likely to be incurred by the Committee's professionals and the Debtors' professionals in resolving these disputes will likely reduce significantly the funds available for distribution to general unsecured creditors from the GUC Trust. As a result, Black Canyon believes that it would be better for all parties to either consensually (or through mediation) resolve their differences and attempt to establish a fair and equitable distribution scheme for the proceeds of the GUC Trust.

[4] A copy of the Note Purchase Agreement is attached as Exhibit A to the Declaration of Steve Warren submitted concurrently herewith (the "Warren Decl.").

4

landlords and other general unsecured claims in the case. The Note Purchase Agreement provides that the notes issued thereunder (the "Notes") are subordinate to the claims of the Bank under its credit agreement; however, the subordination is subject to a number of important qualifications:

10. First, in order for any payment to be subject to a subordination turnover right, it must be a "Notes Payment" under the Note Purchase Agreement. *See e.g.*, Note Purchase Agreement ¶ 14.2 (Senior Indebtedness entitled to payment in full prior to any "Note Payments").[5] Notes Payments are expressly limited to payments made by "the Company or its Subsidiaries." *See* Note Purchase Agreement ¶ 1.1 (Definition of "Notes Payment").

11. Second, the definition of "Senior Indebtedness" is subject to a carve-out that applies "notwithstanding anything to the contrary" in the Note Purchase Agreement. *See* Note Purchase Agreement ¶ 1.1 (Definition of "Senior Indebtedness"). An obligation cannot be Senior Indebtedness if it is "by its express terms, subordinated in right of payment to any other Indebtedness of the Company." *Id.*

12. Third, any subordination requirement ceases to apply once the Senior Indebtedness is "entitled" to be paid in cash "all amounts due or to become due" thereunder. *See* Note Purchase Agreement at ¶ 14.2. Furthermore, once the Senior Indebtedness is entitled to be paid all amounts due or to be due (and the commitments have been terminated), the noteholders under the Note Purchase Agreement (the "Noteholders") become subrogated to all rights under the Senior Indebtedness. *See* Note Purchase Agreement ¶ 14.5.

---

[5] Paragraph 14.2 of the Note Purchase Agreement provides in relevant part: "[T]he holders of Senior Indebtedness shall first be entitled to receive or retain payment in full in cash or Cash Equivalents of all amounts due or to become due on or in respect of all Senior Indebtedness, before the Holders of the Notes are entitled to receive any Notes Payment, and to that end the holders of Senior Indebtedness shall be entitled to receive, for application to the payment thereof, any Notes Payment which may be payable or deliverable in respect of the Subordinated Obligations in any such proceeding."

5

13.     The Debtors, the Committee and the Bank previously reached agreement on the terms of the GUC Trust that was embedded in the final DIP financing order [Docket No. 271] (the "Final DIP Order").[6] This agreement was not formally noticed on creditors, and the first notice that Black Canyon received that any agreement had been reached was the date of the final financing hearing (the "Final Financing Hearing").

14.     Under the terms of the Final DIP Order, the GUC Trust was established for the benefit of "all unsecured creditors." Final DIP Order, ¶ 17. The Bank agreed that the proceeds were not its collateral, and the Final DIP Order provides that such funds are free of any claims of the Debtors. *Id.* Payments will be made from the GUC Trust by the GUC Trustee (as defined in the Final DIP Order) and not the Debtors or their subsidiaries, and the GUC Trust is an entity independent from those parties. *Id.* The Bank further agreed that it would not receive a distribution on account of its deficiency claim from the GUC Trust until all unsecured creditors were paid in full, thus expressly subordinating its own recovery to those of all other unsecured creditors. *Id.*

15.     Under the Final DIP Order and the DIP Credit Agreement,[7] the Bank is entitled to receive the cash proceeds of the sale of the Debtors' assets under Bankruptcy Code Section 363, and its commitments will be terminated. *Id.*, ¶ 6(e). The Final DIP Order further provides that no distribution will be paid on account of unsecured claims other than payments made through the GUC Trust (payment coming through the GUC Trust rather than as a "Notes Payment" by the Company or its Subsidiaries). *Id.*, ¶ 19. As a result, the payment of the cash proceeds of the Section 363 sale will be the final amount paid to the Bank by the Debtors on

---

[6] A copy of the Final DIP Order is attached as Exhibit B to the Warren Declaration.

[7] Exhibit C to the Warren Declaration is a copy of the DIP Credit Agreement.

account of the Bank's claim. No other payments will be due to the Bank from the Debtors, thus triggering Black Canyon's subrogation rights under the Note Purchase Agreement. The Final DIP Order provides that approval of the DIP Motion covering the DIP Credit Agreement was subject to the terms and conditions of the Final DIP Order, and its terms are expressly binding upon the Bank in its various capacities as a pre-petition and post-petition lender. *Id.*, ¶¶ 1, 13.

16.     At the Final DIP Hearing, the parties reserved their respective positions concerning the subordination language in the Note Purchase Agreement and its application to the terms of the Final DIP Order with respect to the GUC Trust. Consistent with this position, Black Canyon demanded that the Bank, the Committee and the Debtors strike provisions of the draft Final DIP Order that would have called for Black Canyon to waive its right to receive a distribution from the GUC Trust. Warren Decl., Exh. E.

17.     Black Canyon included its unsecured claim in its final bid at the auction; however, the Committee, the Bank and the Debtors rejected Black Canyon's bid. Warren Decl., Exh. D, Auction Tr. at pp. 73:3 through 76:17. They further elected not to give Black Canyon any bid value if it waived such claim as part of the bid. *Id.* at 76:9-15. Instead, they selected a third party bidder. As a result, Black Canyon reserved any rights it had to the GUC Trust distributions. *Id.* at 76:18-25.

The Committee

18.     The Committee is composed of two landlord creditors and three trade creditors/suppliers. According to the Debtors' schedules, these entities are owed approximately $6.4 million. Because Black Canyon was the stalking horse bidder and interested in acquiring the Debtors' assets in the auction, it did not seek appointment to the Committee.

7

## The Motion and Current Stipulation

19.     The Committee, the Debtors, and the Bank (collectively, the "Moving Parties") ask this Court to approve the Stipulation, which expresses a clear intent to "cooperate" to cut off Black Canyon's rights to any recovery on its unsecured claim.

20.     As part of the Stipulation, the Bank would not directly pursue its alleged subordination rights; rather, it would assign that right to the Committee for the benefit of the minority claims held by parties other than Black Canyon. Warren Decl., Exh. E, Sale Hrg. Tr. at 41:7-23. This power would be assigned for the sole purpose of excluding Black Canyon from sharing in the GUC Trust. While the Bank had previously agreed in the Final DIP Order not to receive any distribution from the GUC Trust, the Banks agrees in the Stipulation to remit any payment it does receive from the GUC Trust back to the trust through proposed mechanics that are designed to exclude Black Canyon's claim from ever sharing in any of the distributions. Black Canyon did not consent to the Stipulation and first learned of its existence on the day it was presented to the Court at the sale hearing.

21.     The deal that the Moving Parties describe in their Motion was apparently reached in last-minute negotiations at the auction on October 28, 2010 after Black Canyon left the auction. The Moving Parties do not explain in the Motion what was exchanged at the auction for the purported right to exclude the largest unsecured creditor from participating in the GUC Trust, nor does the Motion explain why it is in the interests of the constituency represented by the Committee to exclude the majority of claim value represented by the Committee from participating.

## ARGUMENT

**A.      Standards for Approving a Settlement**

22.      In determining whether to approve a settlement, the primary consideration for courts within the Third Circuit is whether the settlement is "fair and equitable." *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 833 (Bankr. D. Del. 2008); *In re Exide Techs.*, 303 B.R. 48, 67 (Bankr. D. Del. 2003). Among other things, courts consider "the paramount interest of the creditors." *In re Nutritional Sourcing Corp.*, 398 B.R. at 832 (quoting *In re New Century TRS Holdings*, 390 B.R. 140, 167 (Bankr. D. Del. 2008)); *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (quoting *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)). Determining whether a settlement is fair and equitable requires courts to look "to the fairness of the settlement to other persons, i.e., the parties who did not settle." *Id.* (quoting *In re Nutraquest*, 434 F.3d 639, 645 (3d Cir. 2006)).

23.      The Stipulation submitted by the Moving Parties for Court approval is neither fair nor equitable, and it does not serve the paramount interest of creditors. It ignores the fact that the terms of the Note Purchase Agreement do not apply on these facts, that it is flatly contrary to provisions already approved by the Court in the Final DIP Order, and that it unfairly targets the claims of Black Canyon in order to improve recoveries for a small subset of general unsecured creditors who are the type who sit on the Committee. The Motion must be denied for each independent reason addressed below. Indeed, no effort has been made to satisfy the applicable standard for approval. To the extent the Moving Parties argue that the Stipulation does not prejudice Black Canyon's rights, there is no purpose served in seeking the Court's endorsement.

9

B.    **The Committee Cannot Properly Negotiate a Deal That Favors Minority Claimholders (Including the Committee Members) at the Expense of the Largest Unsecured Creditors in the Class.**

24.    This is a case of the Committee actively negotiating against the interests of its largest constituent in favor of the interests of a small subset of general unsecured claims in dollar amount. As noted above, Black Canyon is the largest unsecured creditor and is, thus, the largest constituent of the Committee. The Committee is the statutory representative for the interests of *all* general unsecured creditors in these cases, and the Committee as a whole, as well as each member of the Committee, owes fiduciary duties to the entire class. *In re Nationwide Sports Distributors*, Inc., 227 B.R. 455, 465 (Bankr. E.D. Pa. 1998) ("both official creditors' committees and their members owe a fiduciary duty to their constituencies"); *In re Barney's, Inc.*, 197 B.R. 431, 442 (Bankr. S.D.N.Y. 1996) ("the committee and its members have a fiduciary duty to all creditors represented by the committee."); *In re Bohack Corp.*, 607 F.2d 258, 262 (2d Cir. 1979) "([T]he committee owes a fiduciary duty to the creditors, and must guide its actions to safeguard as much as possible the rights of minority as well as majority creditors."); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 836 (Bankr. D. Del. 2008) ("it is true that an official committee of unsecured creditors holds a fiduciary duty to the committee's constituencies."); *In re World Health Alternatives*, 344 B.R. 291, 303 (Bankr. D. Del. 2006) *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 655, 664 (Bankr. E.D. Pa. 1987). These duties obligate each Committee member "to act with undivided loyalty for the benefit of all of the unsecured creditors." *In re ABC Automotive Prods. Corp.*, 210 B.R. 437, 441 (Bankr. E.D. Pa. 1997).

25.    As part of a Committee member's duties to its constituents, the member must not seek to gain any financial advantage or other better treatment than the other members of the class it represents. *In re Westmoreland Human Opp., Inc. v. Walsh (In re Westmoreland*

10

*Human Opp., Inc.)*, 321 B.R. 561, 573 (W.D. Pa. 2005) ("Membership on the committee is not intended to grant to the members a financial advantage or priority over their constituents. Good faith, trust and candor are essential to ensure that the work of the committee does not come to a standstill and is completed for the benefit of all unsecured creditors. On this basis, the Court believes that a fiduciary duty exists between all members of an unsecured creditors committee.").[8]

26.     In *In re Nutritional Sourcing Corp.*, the Court refused to approve a settlement, and consequently refused to confirm a plan of reorganization, where a major element of the settlement was the definition of the term "trade creditor." Under the definition employed by the settlement, only some of the trade creditors of the debtors qualified to receive certain distributions under the plan. *In re Nutritional Sourcing Corp.*, 398 B.R. at 821. Accordingly, the remaining trade creditors would receive less than their counterparts despite the fact that all of the trade creditors qualified as general unsecured creditors. The court held that because only the trade creditors receiving greater distributions were represented on the official committee of unsecured creditors (there was not a single member representing the other trade creditors), the settlement (and therefore the plan) could not be approved because the settlement was neither fair and equitable nor in the paramount interest of the creditors. In so ruling, the court noted that the restrictive definition of trade creditor "severely impacts 'non-goods' trade creditors who were

---

[8] The Stipulation seeks to use estate assets and an estate appointed position to acquire a contractual subordination right existing solely between Black Canyon and the Bank for the purpose of favoring certain of its members over others. As among themselves, Black Canyon is *pari passu* with the other creditors who serve on the Committee. The Stipulation improperly seeks to use the Committee control to change the constituents' relative rights against each other. The Committee could just have easily negotiated for equal treatment for all of the *pari passu* unsecured creditors, which is exactly what the existing Final DIP Order would mandate but for the proposed Stipulation. Since the Bank is not getting any benefit from the GUC Trust, the Committee should abide by the *pro rata* distribution.

not at the negotiating table and who were not adequately represented in their absence." *Id.* at 835.

27.     In *In re Nationwide Sports Distributors, Inc.*, the Court refused to approve a settlement negotiated by members of the official committee of unsecured creditors for their individual benefits, and not the benefit of the general unsecured creditors as a class. In that case, the debtors and seven creditors (each a member of the official committee of unsecured creditors) resolved a motion to appoint a trustee through an insider's agreement to purchase the seven creditors' claims and the debtors' agreement to release estate claims held against those creditors. Under this arrangement, the seven creditors were to receive 70% distributions while the other general unsecured creditors would only receive 40% distributions. *In re Nationwide Sports Distributors, Inc.*, 227 B.R. at 463-64. The court rejected the proposed resolution of the motion because the fiduciary duty that members of the committee owe to their constituencies "prohibits members of the creditors' committee from using their position to advance their own individual interests." *In re Nationwide Sports Distributors, Inc.*, 227 B.R. at 463 (citing *In re Map International, Inc.*, 105 B.R. 5, 6 (Bankr. E.D. 1989). The Court went on to hold that "a committee member must be mindful of this fiduciary responsibility and must avoid acting upon any matter which may result in a benefit to him in particular as opposed to the members of the class which he represents." *Id.* at 464.

28.     Even if the amounts to be distributed from the GUC Trust did represent a true "carve-out" from the Bank's collateral, it would be improper for the Committee to negotiate a deal that excludes certain of its constituents from the recovery pool available to unsecured creditors, in favor of those creditors who are similarly situated with those who sit on the Committee. As the court stated in *Westmoreland*:

It is clear that the unsecured creditors committee represents the unsecured creditors. To be effective in that representation, it is necessary for the committee to speak with one voice. To permit the committee members to serve their individual interests in a manner which is detrimental to other unsecured creditors would not only violate their established fiduciary duty to their constituents, the unsecured creditors, but also frustrate the purpose behind the committee's mandatory existence under the Bankruptcy Code. *Id.*

29.     In *Westmoreland*, the court found that members of a creditors committee hold fiduciary duties to other committee members even with respect to "property that falls outside of the debtor's bankruptcy estate." In determining that the fiduciary duty that exists "vertically" between unsecured creditors and committee members also exists "horizontally" between committee members, the court reasoned that "[m]embership on the committee is not intended to grant to the members a financial advantage or priority over other constituents." *Id.* It is similarly improper for the Committee to reach an agreement that prefers the financial interests of the committee members and other similarly situated creditors over the interests of the entire unsecured creditor body that it represents. This is true regardless of whether the property that is subject to the Stipulation is determined to fall inside or outside of the Debtor's estate.

30.     It is improper for the Committee to negotiate an arrangement to exclude the largest unsecured creditor from participating in a trust fund that is the sole source of recovery for unsecured creditors, particularly when excluding the largest unsecured creditor happens to greatly increase the recovery of the members of the Committee themselves. It is also inappropriate for the Committee to sign a stipulation forcing the Debtors and the Bank to "cooperate" in enforcing the subordination provisions against Black Canyon.[9] The Committee

---

[9] The Stipulation states that, to the extent Black Canyon and other Noteholders disagree with Committee efforts to enforce the Note Purchase Agreement subordination provisions, the Bank and the Debtors "will cooperate with the Committee in its efforts to enforce the subordination provisions of the Note Purchase Agreement . . . ." Stipulation, ¶ 5.

and the Debtors may not use estate assets and compromise estate claims only to benefit *some* of the unsecured creditors of the estate. Ultimately, these parties are using their statutory powers to obtain a result that does not benefit creditors as a whole, but only certain unsecured creditors of the type who control the Committee.

31. As part of the Final DIP Order, the Bank agreed that it would not participate in the GUC Trust. The sole purpose of this after-the-fact Stipulation is to give an argument to a small minority of claims in dollar amount that they are entitled to all of the proceeds of the GUC Trust. Such a result is not fair, nor is it consistent with the obligation of the Committee to represent all unsecured creditors.

C. **Cases Approving "Gift" Arrangements Do Not Discriminate Amongst Members of the Class of Unsecured Creditors.**

32. The Moving Parties may argue that the Bank has "gifted" the funds in the GUC Trust to all general unsecured creditors other than Black Canyon, and therefore is it entitled to make the payments for the benefit of whomever it chooses. First, as noted above, this contradicts the express language in the Final DIP Order that created the GUC Trust for *all unsecured creditors* other than the Bank. Second, by making such a "gift," the Bank violates applicable authority on gift arrangements in bankruptcy cases.

33. This Court has approved "gift" arrangements related to a concession by senior secured creditors or third parties for the benefit of *all unsecured creditors. See, e.g., In re TSIC, Inc.*, 393 B.R. 71 (Bankr. D. Del. 2008); *In re World Health Alternatives, Inc.*, 344 B.R. 291 (Bankr. D. Del. 2006). In this respect, these decisions are consistent with the Final DIP Order, but not with the requested modifications set forth in the Motion and in the Stipulation. Courts in this District that have approved "gifting" arrangements negotiated by a creditors committee where such arrangements have ensured that all members of the general unsecured

14

class benefit from the concessions made. *Id.* Faced with challenges made on behalf of other classes of creditors, they have noted that "the official committee of unsecured creditors owes its fiduciary duty only to the general unsecured creditors" and not to the estate as a whole. *World Health Alternatives, Inc.*, 344 B.R. at 303.

34.     In the instant case, the Moving Parties seek to turn that egalitarian purpose to benefit all unsecured creditors on its head, and use the power of their appointed estate positions to manufacture a basis to *exclude* the largest unsecured creditor from receiving distributions from a trust that was previously established for the benefit of the entire unsecured creditor body. In considering a gifting stipulation in *TSIC*, this Court found that a Committee properly exercises its duty if it considers the interests of "*the class*" that it represents. *TSIC*, 393 B.R. at 78. (emphasis supplied). Here, the proposed Stipulation manifestly ignores the interests of the class of unsecured creditors. It is a "zero sum" proposal that would harm the holders of 90% of the class claims to benefit the remaining 10% of unsecured claims. Moreover, this is not a case where the Stipulation itself creates the res of the trust that would otherwise not exist. *See TSIC*, 393 B.R. at 79. Rather, the res already exists as a result of the Final DIP Order and is not part of the Bank's collateral (nor a fund that can even be used to pay the Bank's deficiency claims). The Stipulation merely seeks to create a skewed distribution of that trust res among the class members. Thus, the Motion contradicts the applicable law for "gift" arrangements. In short, the Motion seeks to use an approach designed to achieve a *pro rata* distribution to a class to effectuate impermissible discrimination for the benefit of smaller holders at the expense of larger holders.

15

**D. The Final DIP Order Waives Any Rights the Bank Had to Subordinate Black Canyon's Interest to the Bank's Interest in GUC Trust Funds.**

35.     The express terms of the Final DIP Order are manifestly inconsistent with the current effort to enforce the benefit of the subordination for third parties other than the Bank. Having already agreed not to obtain a distribution on account of its claim from the GUC Trust, the Bank's claim provides no justification for excluding Black Canyon. The GUC Trust is already subject to provisions that make it for the benefit of *all unsecured creditors other than the Bank*. Final DIP Order, ¶ 17.

36.     Any ability the Bank previously held to enforce the subordination provisions against Black Canyon were inherently compromised by virtue of the entry of the Final DIP Order. The language could not be clearer. Pursuant to the Final DIP Order, the Court authorized the formation of a trust (the GUC Trust) "for the benefit of all of the Debtors' general unsecured creditors . . . ." Final DIP Order, ¶ 17. The Bank also voluntarily waived any right to look to the GUC Trust to recover on its secured or unsecured claims. *Id.*

37.     To make clear the Bank's interests did not give rise to any claim against GUC Trust funds, an account was established to hold the funds free and clear of all liens, claims and encumbrances of the Debtors, the Prepetition Agent and the DIP Agent (identified in the Final DIP Order as the "Prepetition Secured Parties"). The Prepetition Secured Parties also waived *any* right to recovery from the GUC Trust on account of unsecured deficiency claims *"unless and until all of the holders of allowed general unsecured claims in these Chapter 11 Cases shall have been paid in full." Id.* (emphasis added). While the parties asked for Black Canyon to waive its rights to recovery from the GUC Trust, it did not consent, and the Final DIP Order as entered did not waive Black Canyon's rights to share in any distribution under the GUC

Trust. The Final DIP Order became final before the Stipulation between the Moving Parties was executed.

38.    Subordination rights can be altered by a later agreement. *Midwest Sav. Assoc. v. Nat'l Western Life Ins.*, 752 F.Supp. 1282, 1287 (D. Minn. 1991) (noting that debentures that on their face indicate they are subordinated would not prevent parties from executing a contemporaneous or later agreement to improve the debentures' priority position.).[10] By agreeing to enter into the DIP Credit Agreement and consenting to the entry of the Final DIP Order, the Bank effectively negotiated away any rights it previously held to subordinate Black Canyon's claim. In any event, given that it has agreed not to participate in any distribution from the GUC Trust, there is no basis in the Note Purchase Agreement to enforce a subordination and thereby prohibit Black Canyon from sharing *pari passu* in the funds of the GUC Trust.

39.    Moreover, the subordination provisions of the Note Purchase Agreement are no longer enforceable against funds held in the GUC Trust under state law waiver principles.[11]  To demonstrate waiver, a party must show an "intent not to claim the purported advantage." *Hadden v. Consol. Edison Co. of N.Y., Inc.*, 382 N.E.2d 1136, 1138 (N.Y. 1978). Waiver may be accomplished by express agreement or by conduct or a failure to act that evidences the intent not to claim a purported advantage. *Dice v. Inwood Hills Condominium*, 655 N.Y.S.2d 562, 562 (N.Y. 1997). The Final DIP Order states that the GUC Trust is being established for the benefit of "all general unsecured creditors" and unambiguously states that the

---

[10] Collier also notes that the legislative history of Section 510(a) supports the ability of a high-priority creditor to waive any rights it held under a subordination agreement in the context of a plan's distribution scheme. 4 Collier on Bankruptcy ¶ 510.03 (2010 ed.) ("If a class that is a beneficiary of a subordination agreement later accepts a plan that modified or eliminates the subordination, then the agreement as modified, or eliminated, will be enforced in lieu of the original agreement.").

[11] Both the Note Purchase Agreement and the DIP Credit Agreement are governed by New York law. Note Purchase Agreement, § 17.9(a); DIP Credit Agreement, § 1.06.

Bank relinquished the ability to look to the GUC Trust for any recovery on its secured or unsecured claims.

40.     Even though the Bank already negotiated away any rights it held to distributions from the GUC Trust, the Stipulation attempts to transfer purported rights held by the Bank to receive a distribution from the GUC Trust to the Committee. Stipulation, ¶ 4. The *only* way that the Bank could enforce the Note Purchase Agreement in this situation is if the Moving Parties are allowed to modify the terms of the existing Final DIP Order. However, the Stipulation itself prevents this very outcome when it states that nothing therein "shall be deemed an amendment, waiver or modification of any term of the Final DIP Order, including, but not limited to, the GUC Trust Rights . . . ." Stipulation, ¶ 7.

### E.     The Note Purchase Agreement Language Subordinating Black Canyon's Rights Is Inapplicable on These Facts.

41.     While the Stipulation attempts to assign any benefit that the Bank obtains from the subordination provisions of the Note Purchase Agreement to the Committee, the express terms of the subordination language in the Note Purchase Agreement are inapplicable in this situation. Under the Note Purchase Agreement, the subordination language only requires that Black Canyon and other Noteholders subordinate any "Notes Payments."[12] "Notes Payments" are defined in the Note Purchase Agreement as "any payment or any distribution of any kind or character . . . by the Company [the Debtors] or any Subsidiary of the Company . . . ."[13] The GUC Trust, *not* the Debtors or any subsidiary of the Debtors, holds the funds in the GUC Trust which are the subject of the Stipulation. As any payments would be made out of

---

[12] Note Purchase Agreement, § 14.2

[13] Note Purchase Agreement, pp. 17-18

funds controlled by the GUC Trust (a fund which the Bank has disclaimed for satisfaction of any of its secured or unsecured claims), the subordination provisions are not applicable.

42.     Furthermore, the definition of "Senior Indebtedness" under the Note Purchase Agreement states that notwithstanding anything to the contrary, "Senior Indebtedness" shall not include "any Indebtedness which is, by its express terms, subordinated in right of payment to any other Indebtedness of the Company." Note Purchase Agreement at p. 26. Under the Final DIP Order, the Bank *expressly* agreed to subordinate its deficiency claim as against the funds in the GUC Trust to the claims of *other unsecured creditors*. The Final DIP Order is binding on the Bank in all of its capacities; thus, given this express subordination to other creditors, the obligations under the credit agreement are no longer Senior Indebtedness under the Note Purchase Agreement.

43.     Similarly, given the terms of the Final DIP Order, the conditions for Black Canyon to become subrogated to the Senior Indebtedness have occurred (even assuming the debt in question remains Senior Indebtedness despite the subordination). Thus, the terms of the Stipulation interfere with Black Canyon's rights and are unenforceable.

44.     Because even a cursory review of the Note Purchase Agreement resolves any argument concerning the terms of the subordination, it is doubly inappropriate for the Stipulation to be approved. The Stipulation can only lead to unwarranted litigation and dissipation of estate resources in a vain attempt to favor certain unsecured claims over others. The unambiguous terms of the Note Purchase Agreement dispel any argument that the GUC Trust may be redistributed as the Committee apparently hopes.

**F.     The Subordination Rights May Not Be Separated From The Bank's Claims Underlying These Rights.**

45.     The subordination rights related to the Notes are interconnected with the Bank's claims and may not be assigned to or for the benefit of other creditors in the manner proposed by the Stipulation.  In essence, the Stipulation seeks to assign the subordination rights to make unintended third party beneficiaries out of the minority of unsecured creditors.  That impermissibly expands the subordination in a manner contrary to applicable law.

46.     A subordination agreement is a type of intercreditor agreement; that is, a contract.  It has meaning based only upon each contracting party's claims, and therefore it is only enforceable to the extent it affects rights held amongst the parties to the agreement or third party beneficiaries of the agreement.  *In re Henzler Mfg. Corp.*, 36 B.R. 303, 305 (Bankr. N.D. Ohio 1984) (holding that subordination agreement was enforceable as between creditor parties to agreement, but could not be enforced as against trustee); *In re Hart Ski Mfg. Co.*, 5 B.R. 734, 736 (Bankr. D. Minn. 1980) (noting the purpose of a subordination agreement "is to allow the consensual and contractual priority of payment to be maintained between creditors among themselves in a bankruptcy proceeding."); *In re Kors, Inc.*, 819 F.2d 19, 24 (2d Cir. 1987) (trustee could not enforce subordination agreement under lien avoided pursuant to strong arm powers).  Here, neither the Committee nor the minority unsecured creditors are parties to or intended beneficiaries of the subordination.

47.     Pursuant to the Note Purchase Agreement executed in 2005, Black Canyon agreed that its claims against the Debtor were general unsecured claims and were subordinate to the claims of holders of Senior Indebtedness.  The Note Purchase Agreement did *not* affect Black Canyon's rights in relation to unsecured creditors other than holders of Senior Indebtedness, and the Note Purchase Agreement's third party beneficiary provision states that

only holders of Senior Indebtedness are third party beneficiaries.[14]   As to other general

unsecured creditors, Black Canyon is entitled to share *pari passu* in any distribution in this case.

48.     Moreover, other general unsecured creditors cannot qualify for third party

beneficiary status because nothing in the Note Purchase Agreement purports to extend third party

beneficiary protections to them, nor was this ever intended.  New York law provides third party

beneficiary status only where "the circumstances indicate that the promisee intends to give the

third party the benefit of the promised performance."  *Trans-Orient Marine Corp. v. Star

Trading & Marine, Inc.*, 925 F.2d 566, 573 (2d Cir. 1991) (citing *Restatement (Second) of

Contracts § 302(b)*); *see also First Keystone Consultants, Inc. v. DDR Const. Svcs.*, 904

N.Y.S.2d 113, 115-16 (N.Y. App. Div. 2010) (holding that plaintiff was not third party

beneficiary of agreement where 'no third party beneficiaries' clause in agreement showed there

was no intent to benefit any other person).  A party maintaining merely an incidental benefit to a

contract is not a third party beneficiary.  *McPheeters v. McGinn, Smith & Co.*, 953 F.2d 771, 773

(2d Cir. 1992).  Other general unsecured creditors cannot stand in the Bank's third party

beneficiary "shoes" because they do not hold the Bank's claims and Black Canyon did not

bargain for broad subordination to all unsecured creditors.[15]   Indeed, the purpose of the

subordination provisions of the Note Purchase Agreement was *not* to extend protections to other

general unsecured creditors or increase their recovery at the expense of the Notes.  This alone is

a basis to prevent other unsecured creditors from seeking to extend the subordination provisions

of the Note Purchase Agreement to their own claims.

---

[14] Note Purchase Agreement, § 14.11.

[15] As noted above, even the Bank has waived any right to enforce the subordination or share in the proceeds of the GUC Trust.

**G. The Stipulation is a De Facto Plan of Liquidation That Fails to Comply With the Bankruptcy Code and the Third Circuit Ruling in *Armstrong*.**

49. The instant Stipulation is a *de facto* plan of liquidation lacking the protections afforded by the Bankruptcy Code. The Final DIP Order provides that the GUC Trust is the sole source of recovery for all unsecured creditors of these estates (in fact, the Final DIP Order affirmatively bars all unsecured creditors from receiving any other distribution from the Debtors' assets). Final DIP Order, ¶ 19. At the time it was approved, this provision was fair only because *all unsecured creditors* were entitled to share before the Bank obtained any benefit therefrom. To now attempt to bar the largest unsecured creditor from sharing in the trust would make the existing exclusion particularly unfair. In fact, if the proposed modifications are engrafted onto the existing GUC Trust, it will be a virtual plan -- a plan that violates the fundamental principles established in the Bankruptcy Code to bar unfair discrimination. *See In re Iridium Operating LLC*, 478 F.3d 452, 464 (2d. Cir. 2007) ("[W]hether a particular settlement's distribution scheme complies with the Code's priority scheme must be the most important factor for the bankruptcy court to consider when determining whether a settlement is "fair and equitable" under Rule 9019. The court must be certain that parties to a settlement have not employed a settlement as a means to avoid the priority strictures of the Bankruptcy Code.").

50. As a result, the proposed Stipulation violates *In re Armstrong World Industries, Inc.*, 432 F.3d 507, 513 (3rd Cir. 2005). In *Armstrong*, the Third Circuit found that a class of unsecured creditors violated the absolute priority rule when the class gifted a portion of their distributions to equity holders over the objection of a co-equal class of unsecured creditors who would not be paid in full in a chapter 11 plan. *Id.* at 514. The distribution scheme contemplated in the Stipulation similarly does not comply with the Bankruptcy Code's priority scheme, and is an obvious attempt to do violence to the distribution scheme mandated under the

22

Code of a plan of liquidation. As noted above, the proposed Stipulation does not fall within the ambit of the gift settlement cases in this District such as *TSIC* and *World Health* that are an exception to the *Armstrong* decision. *See TSIC, 393 B.R.* at 77 (distinguishing *Armstrong* from proposed gift stipulation in that case where, *inter alia*, a gift was to the entire class of unsecured creditors represented by the Committee and (i) the payment did not originate from proceeds of the estate or the lien of the senior creditor but represented future royalties, (ii) the property would not come into the estate even if the Court refused to approve the agreement and (iii) none of the affected creditors objected to the agreement). Not a single one of those distinctions from *Armstrong* apply to the instant case.

**H.** **The Motion Fails to Even Attempt to Satisfy the Applicable Standards for Settlements.**

51. Finally, the proponents of the Motion fail to disclose the basis of their late-breaking agreement with the Bank. They do not even identify what they purport to have negotiated away in exchange for the instant modification to the existing GUC Trust that benefits a subclass of the unsecured creditors. The Moving Parties need to disclose what they gave for this "concession" and the basis for negotiating away the right of Black Canyon to share in the recovery.[16]

---

[16] The Bank's voluntary relinquishment of the GUC Trust funds as part of the Final DIP Order was a conscious decision to seek the Committee's release of potential causes of action against the Bank. Unsecured creditors other than the Bank would only be entitled to distributions from the GUC Trust if the Committee first decided not to challenge the validity and extent of the Bank's liens. Final DIP Order, ¶ 17. Unlike the Final DIP Order, this Stipulation lacks any clear, public explanation of the benefits gained by the Bank or the Debtors in exchange for the agreement to prejudice Black Canyon's interests. The sale of the Debtors' assets to a third party has already been approved and a Final DIP Order has been entered. As noted in the Stipulation itself, the Committee already concluded on October 22 (nearly a full week before the Stipulation was signed) that it would not be challenging the validity, perfection, priority, extent and enforceability of the interests and liens of the DIP Agent and the Prepetition Agent. In any event, whatever benefits the Committee and the Debtors conferred on the Bank, they would be estate rights. The Bank has clearly given up any right to the GUC Trust, and the gratuitous effort to favor a small subset of unsecured claims should not be condoned.

RLF1 3632596v. 2

## CONCLUSION

52.     The Moving Parties are attempting to condone their private efforts to cut off Black Canyon's rights to recovery from the GUC Trust. They give no basis or reason for the Court to approve their efforts (whether now or at any time in the future). The "goal" of the Stipulation itself is improper -- exclusion of the majority in unsecured claims from any benefit in a plan distribution. Even if all of Black Canyon's defenses were preserved, the parties have failed to meet any of the most basic requirements for approval of a settlement -- nor have they even tried to do so in the moving papers. Moreover, no insulation should be given to any third parties for claims that may arise as a result of the putative agreement or otherwise.

WHEREFORE, Black Canyon respectfully requests that the Court deny the Moving Parties' request for approval of the Stipulation.

Dated: November 29, 2010
       Wilmington, Delaware

Respectfully submitted,

Mark D. Collins (No. 2981)
RICHARDS LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

- and -

Stephen H. Warren
Ana Acevedo
Michael C. Heinrichs
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

*Co-Counsel for Black Canyon*

24