# EXHIBIT

# 1

ASSET PURCHASE AGREEMENT

among

LANDRY'S HOLDINGS, INC.,

LANDRY'S RESTAURANTS, INC.,

CLAIM JUMPER RESTAURANTS, LLC,

and

CLAIM JUMPER MANAGEMENT, LLC

Dated as of October 28, 2010

TABLE OF CONTENTS

Page

ARTICLE I
ACTIONS AT CLOSING

| | | |
|---|---|---|
| Section 1.1 | Conveyance of Transferred Assets | 2 |
| Section 1.2 | Assumption of Obligations | 2 |
| Section 1.3 | Excluded Assets and Retained Obligations | 2 |
| Section 1.4 | Purchase Price. | 2 |
| Section 1.5 | Purchase Price Adjustment. | 3 |
| Section 1.6 | Closing. | 3 |
| Section 1.7 | Deliveries by Buyer. | 3 |
| Section 1.8 | Deliveries by Sellers. | 4 |
| Section 1.9 | Affiliate Acquisitions. | 4 |
| Section 1.10 | Allocation of Cash Purchase Price. | 4 |
| Section 1.11 | Withholding. | 4 |
| Section 1.12 | Bulk Sales Laws. | 5 |
| Section 1.13 | Farmer's Liens. | 5 |

ARTICLE II
REPRESENTATIONS AND WARRANTIES OF SELLERS

| | | |
|---|---|---|
| Section 2.1 | Organizational Matters. | 5 |
| Section 2.2 | Authority. | 6 |
| Section 2.3 | No Conflict. | 6 |
| Section 2.4 | Required Filings; Consents. | 7 |
| Section 2.5 | Financial Statements. | 7 |
| Section 2.6 | Operation of the Business. | 8 |
| Section 2.7 | Absence of Certain Changes or Events. | 8 |
| Section 2.8 | Holdco and Gold Rush. | 8 |
| Section 2.9 | Litigation. | 9 |
| Section 2.10 | Compliance with Laws. | 10 |
| Section 2.11 | Real Estate Leases; Personal Property. | 11 |
| Section 2.12 | Taxes. | 12 |
| Section 2.13 | Environmental, Health and Safety Matters. | 12 |
| Section 2.14 | Insurance | 13 |

| | | |
|---|---|---|
| Section 2.15 | Seller Material Contracts. | 13 |
| Section 2.16 | Employment Matters. | 14 |
| Section 2.17 | Intellectual Property. | 16 |
| Section 2.18 | Related-Party Transactions. | 19 |
| Section 2.19 | Board Approval and Recommendations. | 19 |
| Section 2.20 | Brokers. | 19 |
| Section 2.21 | USA PATRIOT Act. | 19 |
| Section 2.22 | No Other Representations or Warranties. | 19 |

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF BUYER

| | | |
|---|---|---|
| Section 3.1 | Incorporation. | 19 |
| Section 3.2 | Authority. | 20 |
| Section 3.3 | No Conflict. | 20 |
| Section 3.4 | Required Filings; Consents. | 20 |
| Section 3.5 | Litigation. | 21 |
| Section 3.6 | Brokers. | 21 |
| Section 3.7 | Financial Capability. | 21 |
| Section 3.8 | No Other Representations or Warranties. | 21 |

ARTICLE IV
COVENANTS

| | | |
|---|---|---|
| Section 4.1 | Access and Information. | 21 |
| Section 4.2 | Reasonable Best Efforts. | 22 |
| Section 4.3 | Tax Matters. | 22 |
| Section 4.4 | Further Assurances. | 23 |
| Section 4.5 | Notification. | 24 |
| Section 4.6 | Assistance in Negotiations and Proceedings. | 24 |
| Section 4.7 | Employment Matters. | 25 |
| Section 4.8 | Confidentiality. | 27 |
| Section 4.9 | Gift Card Liability; Coupons. | 27 |
| Section 4.10 | Casualty. | 29 |
| Section 4.11 | Name Change. | 29 |
| Section 4.12 | Permits. | 29 |
| Section 4.13 | Environmental Matters. | 30 |

Section 4.14    Additional Sellers................................................................................................30
Section 4.15    Public Statements..............................................................................................30
Section 4.16    Stock Sale..........................................................................................................30
Section 4.17    Liquor Licenses.................................................................................................31
Section 4.18    Fountain Valley.................................................................................................31

ARTICLE V
    CONDITIONS TO CLOSING

Section 5.1    Conditions to the Obligations of Buyer and Sellers...........................31
Section 5.2    Conditions to the Obligations of Buyer.............................................32
Section 5.3    Conditions to the Obligations of Sellers............................................33

ARTICLE VI
    CONDUCT OF THE BUSINESS

Section 6.1    Conduct of Business in the Ordinary Course.....................................34
Section 6.2    Certain Restricted Conduct................................................................35

ARTICLE VII
    RESTRUCTURING AND BANKRUPTCY MATTERS

Section 7.1    Bankruptcy Court Approval..............................................................37
Section 7.2    Rejected Contracts; Assigned Contracts; Excluded Contracts..........37
Section 7.3    Support of Asset Purchase.................................................................39
Section 7.4    Cooperation.......................................................................................41
Section 7.5    Alternative Transactions...................................................................41
Section 7.6    Release...............................................................................................42

ARTICLE VIII
    TERMINATION

Section 8.1    Termination........................................................................................42
Section 8.2    [Intentionally Omitted]......................................................................44
Section 8.3    Effect of Termination........................................................................45
Section 8.4    Expenses Generally...........................................................................45

ARTICLE IX
    CERTAIN REMEDIES

Section 9.1    Effect of Waiver of Condition...........................................................45
Section 9.2    Specific Performance........................................................................45

ARTICLE X
>
> MISCELLANEOUS
>
> | Section 10.1 | Notices. | 46 |
> | Section 10.2 | Amendment; Waiver; Remedies Cumulative. | 47 |
> | Section 10.3 | No Assignment or Benefit to Third Parties. | 47 |
> | Section 10.4 | Entire Agreement; Survival. | 47 |
> | Section 10.5 | Fulfillment of Obligations. | 48 |
> | Section 10.6 | Severability. | 48 |
> | Section 10.7 | Governing Law; Submission to Jurisdiction; Selection of Forum; Waiver of Trial by Jury. | 48 |
> | Section 10.8 | Time of Essence. | 49 |
> | Section 10.9 | Counterparts. | 49 |
> | Section 10.10 | Headings. | 49 |

ARTICLE XI

> DEFINITIONS AND TERMS
>
> | Section 11.1 | Defined Terms. | 49 |
> | Section 11.2 | Certain Definitions. | 49 |
> | Section 11.3 | Other Provisions Regarding Definitions and Interpretation. | 71 |

# EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A | Financial Statements |

| | |
|---|---|
| Schedule 5.2(g) | Leases |
| Schedule 7.2(a) | Rejected Contracts |
| Schedule 7.2(b) | Assigned Contracts |
| Schedule 11.2(a) | Pre-Closing Schedule |
| Schedule 11.2(b) | Letters of Credit |
| Schedule 11.2(c) | Rejected Vendors |

Sellers' Disclosure Schedule

| | |
|---|---|
| Section 2.6(a) | Restaurants |
| Section 2.9 | Litigation |
| Section 2.10(a) | Permits |
| Section 2.10(b) | Liquor Licenses |
| Section 2.11(b) | Real Estate Leases |
| Section 2.11(c) | Encumbrances |
| Section 2.11(e) | Personal Property |
| Section 2.13 | Environmental, Health and Safety Matters |
| Section 2.14 | Insurance |
| Section 2.15 | Seller Material Contracts |
| Section 2.16 | Employment Matters |
| Section 2.17 | Intellectual Property |
| Section 2.18 | Related Party Transactions |

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (as the same may be amended or supplemented from time to time in accordance with the terms hereof, this "Agreement"), dated as of October 28, 2010 (the "Agreement Date"), is entered into by and among Claim Jumper Restaurants, LLC, a Delaware limited liability company ("Opco"), and Claim Jumper Management, LLC, a Delaware limited liability company ("CJ Management" and, together with Opco, the "Sellers"), and Landry's Holdings, Inc., a Delaware corporation ("LHI"), Landry's Restaurants, Inc., a Delaware corporation (together with LHI, collectively, "Buyer").

WITNESSETH:

WHEREAS, Opco is a wholly-owned Subsidiary (as defined below) of Gold Rush (as defined below) and Holdco (as defined below), and Gold Rush is a wholly-owned Subsidiary of Holdco (each of Holdco and Gold Rush is referred to in this Agreement as a "Parent" and they are collectively referred to as "Parents"; Parents and the Sellers are also referred to collectively in this Agreement as the "Seller Entities" and each is referred to as a "Seller Entity")

WHEREAS, the Sellers operate the Business (as defined below);

WHEREAS, on or about September 10, 2010, each of the Sellers filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (as defined below) (the "Company Bankruptcy Cases") in the United States Bankruptcy Court for the District of Delaware (together with any other court having jurisdiction over the Company Bankruptcy Cases originally administered in the United States Bankruptcy Court for the District of Delaware, the "Bankruptcy Court");

WHEREAS, promptly after the Filing Date (as defined below), each of the Sellers has agreed to file customary motions for the operation of the Business during the pendency of the Company Bankruptcy Cases; and

WHEREAS, upon the terms and subject to the conditions set forth in this Agreement, and as authorized under Sections 363 and 365 of the Bankruptcy Code, Sellers wish to sell to Buyer, and Buyer wishes to purchase from Sellers, all of the Transferred Assets (as defined below), and Buyer is willing to assume the Assumed Obligations (as defined below), through a sale under Section 363 of the Bankruptcy Code, subject to higher and better offers, all as more specifically provided herein.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and undertakings contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

# ARTICLE I
## ACTIONS AT CLOSING

Section 1.1  Conveyance of Transferred Assets. On the terms and subject to the conditions set forth herein, at the Closing, but effective as of the Effective Time, Sellers shall jointly and severally sell, transfer, assign, grant, and convey to Buyer, and Buyer shall acquire and purchase from Sellers, all right, title and interest in, to and under (in each case free and clear of any and all liens (as defined in Section 101(37) of the Bankruptcy Code), claims (as defined in Section 101(5) of the Bankruptcy Code, including, without limitation, claims for successor liability under any theory of Law or equity), Interests, or Encumbrances, in each case pursuant to Section 363(f) of the Bankruptcy Code, whether arising prior to or subsequent to the Filing Date), the Transferred Assets. Notwithstanding the foregoing and anything else in this Agreement to the contrary, the sale, transfer, assignment, grant, and conveyance of the Transferred Assets pursuant to this Agreement shall not include the assumption of any Liability unless Buyer expressly assumes that Liability pursuant to Section 1.2.

Section 1.2  Assumption of Obligations. On the terms and subject to the conditions set forth herein, at the Closing, but effective as of the Effective Time, Buyer shall assume and agrees to discharge or perform when due the Assumed Obligations. Buyer shall not assume, incur, or have any responsibility of any nature with respect to any Liability that is not an Assumed Obligation.

Section 1.3  Excluded Assets and Retained Obligations. Sellers shall retain and be responsible for, and Buyer shall not acquire or assume, (i) the Excluded Assets and (ii) the Retained Obligations, whether a claim in respect thereto is brought on, before, or after the Closing Date.

Section 1.4  Purchase Price.

(a)  Consideration. The aggregate consideration for the sale and transfer of the Transferred Assets, shall be (i) cash in the amount of Forty-Eight Million Three Hundred Thousand Dollars ($48,300,000) (the "Cash Purchase Price") (subject to reduction in certain instances pursuant to Section 1.5) and (ii) the assumption of the Assumed Obligations, which includes (A) the assumption of certain Assumed Seller Obligations and (B) the assumption of up to Twenty-Three Million Three Hundred Thousand Dollars ($23,300,000) of Assumed Seller Pre-Closing Obligations and (C) up to Five Million Dollars ($5,000,000) in cash collateral assumption obligations, and (D) the Assumed WARN Obligations, in each case on the terms and subject to the conditions set forth herein (the "Purchase Price").

(b)  Purchase Price Deposit. In connection with Buyer's participation in the Auction and in accordance with the Bidding Procedures, Buyer has delivered a deposit of One Million Dollars ($1,000,000) (the "Escrowed Funds") to Computershare Trust Company, N.A., in its capacity as escrow agent (the "Escrow Agent"). Buyer was determined to be the Successful Bidder (as defined in the Bidding Procedures) at the conclusion of the Auction. Buyer thus shall, within two (2) Business Days after the date of this Agreement, deliver to the Escrow Agent in immediately available funds an additional amount of Three Million Eight Hundred and Thirty Thousand Dollars ($3,830,000), which is the sum necessary to increase the Escrow Funds to an

amount equal to ten percent (10%) of the Cash Purchase Price as bid by Buyer at the conclusion of the Auction, and such additional amount, together with Buyer's initial deposit of One Million Dollars ($1,000,000), shall thereafter constitute the Escrow Funds. The Escrow Funds shall be released by the Escrow Agent and delivered to either Buyer or Sellers in accordance with the provisions of the Escrow Agreement. Pursuant to the Escrow Agreement, the Escrowed Funds (together with all accrued investment income thereon) shall be distributed as follows:

(1) if the Closing shall occur, the Escrowed Funds shall be applied towards the Cash Purchase Price payable by Buyer to Sellers under Section 1.4(c) hereof and all accrued investment income thereon shall be delivered to Buyer at the Closing;

(2) if this Agreement is terminated by Opco prior to the Closing pursuant to Section 8.1(d)(2) or Section 8.1(d)(4), the Escrowed Funds, together with all accrued investment income thereon, shall be delivered to Sellers; or

(3) in the event of any termination of this Agreement other than a termination by Opco prior to the Closing pursuant to Section 8.1(d)(2) or Section 8.1(d)(4), the Escrowed Funds, together with all accrued investment income thereon, shall be returned to Buyer.

(c) Payment of Purchase Price. On the Closing Date, Buyer shall pay the Cash Purchase Price (less the Escrowed Funds) to Sellers, which shall be paid by wire transfer of immediately available funds into an account designated by Sellers.

Section 1.5  Purchase Price Adjustment. If the Closing Date has not occurred prior to November 19, 2010 (the "Reference Date"), then the Cash Purchase Price shall be reduced by the amount, if any, that the Gift Card Liability as of the end of business on the day immediately prior to the Closing Date exceeds the Gift Card Liability as of the end of business on the Reference Date.

Section 1.6  Closing. The Closing shall take place at the offices of Milbank, Tweed, Hadley & McCloy LLP, 601 S. Figueroa St., Suite 3000, Los Angeles, CA 90017 (or at such other place as the parties may designate in writing) at 10:00 a.m. (Los Angeles, California time) on the third Business Day following the date on which the conditions set forth in Article V (other than those conditions that by their nature are to be satisfied at the Closing but subject to the fulfillment or waiver of those conditions) have been satisfied or waived, provided such date, time and place is mutually acceptable to the parties hereto. The date on which the Closing occurs is called the "Closing Date."

Section 1.7  Deliveries by Buyer. At the Closing, Buyer shall deliver to Opco the following:

(a) the Cash Purchase Price (as adjusted), less the Escrowed Funds;

(b) assignment and assumption agreements in form and substance reasonably acceptable to Buyer and Sellers duly executed by Buyer;

(c) the certificate to be delivered pursuant to Section 5.3(c); and

(d) such other documents, instruments and certificates as any Seller may reasonably request.

Section 1.8     Deliveries by Sellers.  At the Closing, the Sellers shall deliver to Buyer the following:

(a) assignment and assumption agreements and a bill of sale in form and substance reasonably acceptable to Buyer and Sellers duly executed by the applicable Sellers;

(b) possession of the Transferred Assets;

(c) copies of the Business Records (it being understood that any Business Records left at the Real Estate need not be physically delivered, but shall be deemed delivered at the Closing; provided, however, that any original Business Records requested by Buyer shall be delivered to Buyer at the Closing upon such request), with confidential copies thereof to be retained by the Sellers at their discretion (subject to the confidentiality provisions set forth in this Agreement);

(d) the certificate to be delivered pursuant to Section 5.2(c);

(e) subject to Section 4.16, any share certificates together with duly executed stock powers for the transfer of all shares of Newco Stock; and

(f) such other documents, instruments and certificates as Buyer may reasonably request.

Section 1.9     Affiliate Acquisitions.  Notwithstanding anything to the contrary contained in this Agreement, Buyer may elect to have any or all of the Transferred Assets conveyed or transferred to, or any or all of the Assumed Obligations assumed by, one or more of its Affiliates.

Section 1.10    Allocation of Cash Purchase Price.  Sellers and Buyer shall, between the date hereof and the Closing Date, agree to a schedule, allocating the purchase price (as determined for U.S. federal income tax purposes) among the Transferred Assets in accordance with the rules under Section 1060 of the Code and the regulations promulgated thereunder (the "Allocation"). The Allocation, once determined, shall be annexed to this Agreement as an exhibit, and any redetermination of the Allocation shall likewise be annexed to this Agreement.  Buyer shall propose the initial draft of the Allocation to Sellers within 30 days of the Closing Date, and such Allocation shall be binding, absent manifest error.  Sellers and Buyer agree to report the transactions contemplated by this Agreement for all Tax purposes in a manner consistent with the Allocation (except to the extent otherwise required pursuant to a determination within the meaning of Section 1313(a) of the Code) and will provide the other promptly with any other information reasonably required to complete any required Tax Returns.  Buyer, on the one hand, and Sellers, on the other hand, will each notify the other, and will provide the other with reasonably requested cooperation, in the event of an examination, audit, or other proceeding regarding any of the allocations set forth in the Allocation.

Section 1.11    Withholding.  Notwithstanding anything contained herein to the contrary, Buyer and its agents, Representatives, and Affiliates shall be entitled to deduct and withhold any

amounts required to be deducted and withheld under the Code and any other applicable Tax laws from any payments made pursuant to this Agreement. To the extent such amounts are so deducted and withheld, such amounts shall be treated for all purposes of this Agreement as having been paid to the person in respect of whom such deductions and withholdings were made.

Section 1.12  Bulk Sales Laws. Buyer hereby waives compliance by Sellers with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Transferred Assets to Buyer. Pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Transferred Assets shall be free and clear of any and all liens (as defined in Section 101(37) of the Bankruptcy Code), claims (as defined in Section 101(5) of the Bankruptcy Code, including, without limitation, claims for successor liability under any theory of Law or equity), Interests, or Encumbrances, in each case pursuant to Section 363(f) of the Bankruptcy Code, whether arising prior to or subsequent to the Filing Date, including any liens or claims arising out of the "bulk-transfer" Laws.

Section 1.13  Farmer's Liens. Prior to the Closing, Sellers shall pay, satisfy and discharge any and all Farmer's Liens with respect to the Transferred Assets and/or Assumed Obligations or any right or action with respect to a federal statutory lien or trust.

ARTICLE II
REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the separate disclosure schedule (which schedule is qualified in its entirety by reference to the specific provisions of this agreement to which it refers and is not intended to constitute, and shall not be construed as constituting, representations or warranties of the Parties except as and to the extent specifically provided herein, and each section of which qualifies the correspondingly numbered representation and warranty to the extent specified therein and such other representations and warranties to the extent a matter in such section is disclosed in such a way as to make its relevance to the information called for by such other representation and warranty reasonably apparent) delivered by Sellers to Buyer prior to and in connection with the execution of this Agreement and attached hereto (the "Sellers' Disclosure Schedule"), each Seller jointly and severally represents and warrants to Buyer as of the Agreement Date and that each of the following statements is true, correct and complete:

Section 2.1  Organizational Matters.

(a)  Each Seller is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of Delaware. Each Seller has all necessary organizational power and authority to enter into this Agreement and the Ancillary Agreements to which it is a party, to carry out its obligations hereunder and thereunder and to consummate the Asset Acquisition and the other transactions contemplated hereby and thereby. Each Seller has provided to Buyer or its advisors true, correct, and complete copies of such Seller's organizational documents and all amendments thereto and each is in full force and effect. Section 2.1(a) of the Sellers' Disclosure Schedule sets forth the jurisdiction of organization of each Seller and all jurisdictions in which each Seller is qualified to do business.

(b)    Subject to the limitations imposed on such Seller by the Bankruptcy Code as a result of having filed a petition for relief under the Bankruptcy Code, each Seller has the requisite power and authority to own, lease and operate its properties and to carry on the Business as it is now being conducted. Seller is duly qualified or licensed to do business and in good standing in each jurisdiction in which the property owned, leased, operated or managed by it or the nature of the business conducted by it makes such qualification or licensing necessary, except where the failure to be so duly qualified or licensed and in good standing could not reasonably be expected to have a Company Material Adverse Effect.

(c)    Gold Rush and Holdco collectively own and hold all of the outstanding ownership interests in Opco and Holdco owns and holds all of the voting and nonvoting stock of Gold Rush. Except as set forth in the immediately preceding sentence, neither Gold Rush nor Holdco owns or holds any stock or other ownership or interest in any Entity.

(d)    Opco (i) owns and holds all of the outstanding ownership interests in CJ Management and (ii) does not own or hold any stock or other ownership or interest in any other Entity.

(e)    CJ Management does not own or hold any stock or other ownership or interest in any Entity.

Section 2.2    Authority.

(a)    The execution and delivery of this Agreement and the Ancillary Agreements to which any Seller is a party, the performance by Sellers of their obligations hereunder and thereunder, and the consummation by Sellers of the transactions contemplated hereby and thereby, including the Asset Acquisition, have been duly authorized by all requisite limited liability company, corporate, or other organizational action on the part of Sellers, including member, manager, or shareholder approval, if necessary.

(b)    This Agreement has been, and each of the Ancillary Agreements will be at or prior to the Closing, duly executed and delivered by each Seller, and, assuming this Agreement and the Ancillary Agreements constitute legal, valid, and binding obligations of Buyer (to the extent a party thereto), and assuming the due authorization, execution and delivery by the other parties hereto and thereto, this Agreement constitutes, and the Ancillary Agreements will (as of the Closing) constitute, the legal, valid and binding obligation of each Seller, enforceable against each Seller in accordance with its terms, subject to the effect of any applicable bankruptcy, reorganization, insolvency (including, without limitation, all Laws relating to fraudulent transfers), moratorium and similar Laws affecting creditors' rights and remedies generally and subject, as to enforceability, to the effect of general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 2.3    No Conflict. Except as a result of the filing of the Bankruptcy Cases, the execution, delivery and performance of this Agreement and the Ancillary Agreements by each Seller and the consummation by each Seller of the transactions contemplated hereby and thereby do not and will not require any consent, approval or notice under, or conflict with, or result in any violation of, or default (with or without notice or lapse of time, or both) under, or give rise to a

right of termination or purchase, cancellation or acceleration of any obligation or to loss of any license, right or benefit under, or require the consent or approval of any third party, result in the creation of any Encumbrance upon any of the Transferred Assets or any other properties or assets of any Seller under (i) the organizational documents of any Seller, as amended or supplemented, (ii) any loan or credit agreement, note, bond, mortgage, deed of trust or indenture to which any Seller is a party or guarantor, (iii) any Seller Material Contract, including, without limitation, any reciprocal easement or other easement agreement, lease or other occupancy agreement, joint venture agreement, development or related agreement, benefit plan or other agreement, instrument, permit, concession, franchise or license applicable to any Seller or its respective properties or assets or any guarantee by any Seller of any of the foregoing, or (iv) assuming that all filings, notifications, consents, approvals, authorizations and other actions described in Section 2.4 have been obtained or made and subject to the entry by the Bankruptcy Court of the Sale Order, any Law applicable to any Seller or any of their respective properties or assets other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that, individually or in the aggregate, could not have, and could not reasonably be expected to have, a Company Material Adverse Effect.

Section 2.4    Required Filings; Consents. Other than consents, approvals, orders, authorizations, or other actions by, or filing with or notification to, any Governmental Authority in connection with the commencement of the Bankruptcy Cases, and entry of the Bankruptcy Orders, the execution, delivery and performance of this Agreement and the Ancillary Agreements by each Seller and the consummation by Sellers of the transactions contemplated hereby and thereby, including the Asset Acquisition, do not and will not require any Seller to obtain any consent, approval, order, authorization of, registration, declaration or other action by, or filing with or notification to, any Governmental Authority.

Section 2.5    Financial Statements.

(a)    The audited consolidated balance sheet and financial statements of Holdco (including the notes thereto) as of December 31, 2009 and for the three years ended December 31, 2009, together with the report of Holdco's independent auditors (the "Audited Financial Statements") are attached hereto as Exhibit A. The unaudited consolidated balance sheet and financial statements of Holdco (including the notes thereto) as of July 28, 2010 and for the six months ended July 28, 2010 (the "Unaudited Financial Statements" and, together with the Audited Financial Statements, the "Financial Statements") are attached hereto as Exhibit A. The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto) and fairly present, in all material respects, the consolidated financial position of Holdco, Gold Rush and each of the Sellers as of the dates thereof and the consolidated results of their operations and cash flows for the periods then ended, subject in the case of the Unaudited Financial Statements to (i) the absence of footnote disclosures, and (ii) changes resulting from normal immaterial year-end adjustments. There are no subsidiaries of Holdco, Gold Rush or any Sellers that are not consolidated with Holdco for accounting purposes. The books of account and other financial records of Sellers are materially true, correct, and complete. There are no subsidiaries of Holdco, Gold Rush or any Sellers that are not consolidated with Holdco for accounting purposes.

(b) Except as and to the extent set forth on the Financial Statements (including the notes thereto), no Seller has any Liability, and there is no existing condition, situation or set of circumstances that could reasonably be expected to result in any such Liability, that would be required to be reflected or reserved against in a consolidated balance sheet of Holdco and its consolidated subsidiaries prepared in accordance with GAAP as applied in preparing such balance sheet on the Balance Sheet Date or that could, or could reasonably be expected to, have a Company Material Adverse Effect, except for Liabilities incurred (i) in connection with the transactions contemplated by this Agreement (ii) in the Ordinary Course of Business since the Balance Sheet Date that could not reasonably be expected to have a Company Material Adverse Effect or (iii) incurred in connection with certain store closings made with Buyer's prior written consent.

Section 2.6   Operation of the Business. Section 2.6(a) of the Sellers' Disclosure Schedule sets forth a true, correct, and complete list of each restaurant owned or operated by any Seller (the "Restaurants"), together with the state, county, city or other jurisdiction in which such Restaurant is located.

Section 2.7   Absence of Certain Changes or Events. Since the Filing Date, there has not been any Company Material Adverse Effect and, except as specifically contemplated by this Agreement, since the Filing Date, Sellers have conducted the Business and their respective businesses only in the Ordinary Course and there has not been (i) any change in accounting methods, principles or practices by any Seller materially affecting its assets, liabilities or business, except insofar as may have been required by a change in GAAP or applicable Law, (ii) any financing, acquisition or disposition of any real property, or any commitment to do so, made by any Seller, (iii) any damage, condemnation (or action in lieu thereof), destruction or loss (whether or not covered by insurance) with respect to any material Transferred Asset or any other material asset of any Seller, (iv) any declaration, setting aside for payment or payment of any dividend or distribution (whether in cash, stock or property) in respect of any security of any Seller or any redemption, purchase (or repurchase) or other acquisition of any securities of any Seller, (v) any action that would have been prohibited by Article VI of this Agreement if this Agreement were in effect as of the time of any such action, or (vi) any transfer or grant of any right or license to any Entity with respect to Acquired Intellectual Property.

Section 2.8   Holdco and Gold Rush.

(a) Neither Holdco nor Gold Rush owns or has ever owned or holds or has ever held any properties, assets, rights, titles and interests of any kind and nature other than its ownership interests in Opco (and, with respect to Holdco, its ownership interests in Gold Rush), and any proceeds thereof and distributions thereon.

(b) Neither Holdco nor Gold Rush engages or has ever engaged in any business or other activity other than acting as a holding company for ownership interests in Opco (and, with respect to Holdco, its ownership interests in Gold Rush), and other assets and activities incidental thereto that are not material, either individually or in the aggregate.

(c) Except as set forth on Section 2.8(c) of the Sellers' Disclosure Schedule, neither Holdco nor Gold Rush either owes or has ever owed or is otherwise subject to any

#4817-1096-4487
8

Indebtedness, Liabilities or obligations other than its ownership interests in Opco (and, with respect to Holdco, its ownership interests in Gold Rush).

(d) Except as set forth on Section 2.8(d) of the Sellers' Disclosure Schedule, neither Holdco nor Gold Rush is or has ever been a party to any Contract or has or has ever had any interest in any Contract, including in each case any Contract related to or useful in connection with the operation of the Business.

(e) Neither Holdco nor Gold Rush is or has ever been a party to any insurance policies or binders of insurance or programs of self-insurance, including any insurance policies or binders of insurance or programs of self-insurance set forth on Section 2.14 of the Sellers' Disclosure Schedule, or has or has ever had any interest in any insurance policies or binders of insurance or programs of self-insurance, including any insurance policies or binders of insurance or programs of self-insurance set forth on Section 2.14 of the Sellers' Disclosure Schedule, and including in each case any insurance policies or binders of insurance or programs of self-insurance related to or useful in connection with the operation of the Business.

(f) Neither Holdco nor Gold Rush has or has ever engaged any employees, independent contractors or other third parties, including the engagement of any employees, independent contractors or other third parties to provide any services related to the Business or the Transferred Assets.

(g) Neither Holdco nor Gold Rush owns or has ever owned or has any interest in any Intellectual Property, including any Seller Intellectual Property and any Seller-Licensed IP or any other Intellectual Property related to or useful in connection with the operation of the Business.

(h) The Transferred Assets constitute all properties, assets, rights, titles and interests of any kind and nature related to or useful in connection with the operation of the Business or Sellers' performance of their obligations under the Assigned Contracts in the Ordinary Course.

Section 2.9 Litigation. Except as set forth in Section 2.9 of the Sellers' Disclosure Schedule, except in connection with the Bankruptcy Cases and except for claims made in the Ordinary Course with respect to any former or current employees, there are no claims, actions, suits, Proceedings or investigations pending or, to the Knowledge of Sellers, threatened against or affecting the Business, any Seller, or any of their respective properties or assets (i) that, individually or in the aggregate, could or could reasonably be expected to (A) have a Company Material Adverse Effect or (B) prevent or delay the consummation of the transactions contemplated by this Agreement or (ii) that in any manner seeks to prevent or enjoin, alter or delay the Asset Acquisition or the other transactions contemplated by this Agreement or any Ancillary Agreement. There is no Order of any Governmental Authority or arbitrator outstanding against any Seller that has, or could reasonably be foreseen in the future to have, a Company Material Adverse Effect. No claim is pending or has been made since January 1, 2008 under any directors' or officers' liability insurance policy maintained at any time by any Seller or any of their Affiliates. Each Seller's wage and hour policies comply in all material respects with the California Labor

Code and Industrial Welfare Commission Wage Order provisions allegedly violated in Lara v. Claim Jumper.

Section 2.10 Compliance with Laws.

(a) Each Seller complied in all material respects with all Laws applicable to the Business, the Transferred Assets, and its respective business, properties and operations. Except as set forth in Section 2.10(a) of the Sellers' Disclosure Schedule and as may result from the filing of the Bankruptcy Cases, all permits, licenses, certificates, registrations, variances, exemptions, orders, approvals and franchises from all Governmental Authorities ("Permits") required by Law to carry on the Business as it has historically and is now being conducted or that are material to the operation of the Business are held by Sellers (and each Seller is in compliance therewith) and are valid and in full force and effect. No suspension, cancellation or modification of any of the Permits is pending or, to the Knowledge of Sellers, threatened, and no investigation or review by any Governmental Authorities with respect to any Seller is pending or, to the Knowledge of Sellers, threatened, other than investigations or reviews which, individually or in the aggregate, do not and could not reasonably be expected to have a Company Material Adverse Effect. No Seller nor, to the Knowledge of Sellers, any of their respective Representatives, directors, managers, members, partners or officers, has (i) used any fund of any Seller for any unlawful contribution, endorsement, gift, entertainment or other unlawful payment or expense relating to political activity, (ii) made any direct or indirect unlawful payment to any domestic government official or employee from any of any Seller's funds, or (iii) made any bribe, rebate, payoff, influence payment, "kickback" or other unlawful payment to any person or entity with respect to any of any Seller's matters. Seller acknowledges and agrees that nothing in this representation shall reduce or limit any other representation of warranty set forth herein that specifically addresses any compliance issue.

(b) Section 2.10(b)(i) of the Sellers' Disclosure Schedule sets forth a true, correct, and complete list of all Liquor Licenses held by Sellers in connection with the operation of the Restaurants. To the extent required by applicable Law or regulation, Sellers possess a Liquor License for each Restaurant. Each of the Liquor Licenses is in full force and effect and adequate for the current conduct of operations by Sellers and at the Restaurant for which it is issued and has been validly issued. Except as set forth in Section 2.10(b)(ii) of the Sellers' Disclosure Schedule, no Restaurant has received any written notice of any pending or, to the Knowledge of Sellers, threatened, modification, suspension, or cancellation of any Liquor License or any proceeding relating thereto and Sellers have no Knowledge of any such threat. Except as set forth in Section 2.10(b)(iii) of the Sellers' Disclosure Schedule, there are no (A) pending disciplinary actions or (B) past disciplinary actions that have had or could reasonably be expected to have a Company Material Adverse Effect or a material impact on the current operation of the Business or the nature or level of discipline imposed on account of future violations of the Laws related to sales and service of alcoholic beverages. Except as set forth in Section 2.10(b)(iv) of the Sellers' Disclosure Schedule, no Seller is subject to any pending or, to the extent such actions have had or could reasonably be expected to have a Company Material Adverse Effect or a material impact on the current operation of the Business or the nature or level of discipline imposed on account of future violations of the Laws related to sales and service of alcoholic beverages, past, disciplinary actions for violation of any Laws related to sales or service of alcoholic beverages in any state in which a Restaurant is located.

Section 2.11  Real Estate Leases; Personal Property.

    (a)    No Seller owns or holds a fee title in or to any real property.

    (b)    Section 2.11(b) of the Sellers' Disclosure Schedule sets forth a true, correct, and complete list of each lease, sublease, and other similar occupancy Contract, including all amendments, of real property to which any Seller is a party, beneficiary, or obligor or that relate to the Business or any of the Transferred Assets, or to which any of the Transferred Assets (or any rights or benefits thereunder) are subject, whether oral or written (collectively, the "Real Estate Leases"), along with copies of any guaranties of any such Real Estate Lease in Sellers' possession. The Real Estate Leases constitute all of the real properties leased by any Seller or used in connection with the Business, and there are no co-tenants under any of such Real Estate Leases. Each Real Estate Lease is in full force and effect and is valid, binding and enforceable in accordance with its terms against (i) each Seller that is party thereto and (ii) to the Knowledge of Sellers, the other parties thereto, in each case subject to obtaining such Orders as may be required under Section 365 or, if applicable, under Section 1123(b), of the Bankruptcy Code. No Seller, nor to the Knowledge of Sellers, any other party, is in default under any Real Estate Lease or under any guaranty of a Seller's obligations under any Real Estate Lease (and to the Knowledge of Sellers, no event has occurred which, with due notice or lapse of time or both, would constitute such a default) except for such defaults that (x) do not have and could not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, (y) are of the type referred to in Section 365(b)(2) of the Bankruptcy Code or (z) are set forth in Section 2.11(b) of the Sellers' Disclosure Schedule. No Seller, nor to the Knowledge of Sellers, any other party, is in default under any of the Real Estate Leases set forth on Schedule 5.2(g) or under any guaranty of a Seller's obligations under any such Real Estate Lease (and to the Knowledge of Sellers, no event has occurred which, with due notice or lapse of time or both, would constitute such a default) except for such defaults that do not have and could not reasonably be expected to have a material adverse affect on Sellers' operations at such location. Sellers have provided to Buyer a true, correct and complete copy of each Real Estate Lease.

    (c)    To the Knowledge of Sellers, Sellers' leasehold interests under each of the Real Estate Leases are held free and clear of all Encumbrances other than (i) as set forth on Section 2.11(c) of the Sellers' Disclosure Schedule or (ii) Permitted Encumbrances. No purchase option, option to sell, right of first refusal, first offer or first negotiation to purchase or lease, option or right to extend, renew, expand or contract the premises, extension option or renewal option for the lease term, or option to expand the leased premises has been exercised by any Seller under any Real Estate Lease. Except as set forth in Section 2.11(b) of the Sellers' Disclosure Schedule, no Real Estate Lease has been assigned or subleased by any Seller.

    (d)    No Seller has received any written notice from any Governmental Authority to the effect that any condemnation (or action in lieu thereof) or any material rezoning proceedings are pending or threatened with respect to any Real Estate. To the Knowledge of Sellers, there are no proposed or contemplated changes to the configuration or layout of any center or common development in which a Real Estate Lease is located, or to roads, access ways or parking areas used in connection with operations at each such Real Estate Lease, that would have a material adverse affect on Sellers' operations at such location.

(e)     Sellers own or lease all material furniture, fixtures equipment, operating supplies and other personal property used in connection with the Business , in each case free and clear of all Encumbrances, subject to (i) any liens and rights in favor of the landlords as set forth in the Real Estate Leases, (ii) any capital leases, equipment leases or other liens resulting from financings used to acquire the personal property set forth on Section 2.11(e) of the Sellers' Disclosure Schedule and Permitted Encumbrances.

(f)     All of the Real Estate Leases that are, or are subject to, ground leases are listed on Section 2.11(f) of the Sellers' Disclosure Schedules and Sellers own the improvements located on the Real Estate covered by such ground leases. Such improvements are the sole property of Sellers, are free of Encumbrances other than Permitted Encumbrances and are in good condition and repair, with no material items of deferred maintenance or repairs outstanding.

Section 2.12     Taxes.

(a)     All Tax Returns required to be filed with respect to the Business, the Transferred Assets and the Assumed Obligations have been duly and timely filed and all Taxes due with respect to the Business, the Transferred Assets, and the Assumed Obligations have been duly and timely paid, except to the extent the failure to file or failure to pay could not, individually or in the aggregate, result in a Company Material Adverse Effect.

(b)     Each of the Seller Entities has withheld all material Taxes required to be withheld with respect to any employees, independent contractors or other third parties related to the Business or the Transferred Assets and, to the extent due and payable, has duly and timely paid to the appropriate authorities or set aside in an account for such purpose proper and accurate amounts for all periods through the Agreement Date and through the Closing Date in compliance with applicable Laws.

(c)     There is no lien for Taxes upon any of the Transferred Assets nor, to the Knowledge of Sellers, is any taxing authority in the process of imposing any lien for Taxes on any of the Transferred Assets, other than liens for Taxes that are not yet due and payable.

(d)     There is no action, suit, Proceeding, investigation, audit, claim or assessment presently in progress or proposed in writing with regard to any Taxes that relate to either the Transferred Assets or the Business.

(e)     Each Subsidiary of Opco is disregarded as an entity separate from its owner (within the meaning of Treasury Regulation section 301.7701-3(b)(1)(ii)).

Section 2.13     Environmental, Health and Safety Matters. Except as set forth in Section 2.13 of Sellers' Disclosure Schedule or could not reasonably be expected to have a Company Material Adverse Effect, to the Knowledge of Sellers (i) Sellers hold all the environmental, health and safety Permits necessary for the operation of the Business as currently operated and the use, occupancy or operation of each Transferred Asset and have timely applied for renewal of the same, (ii) Sellers are in compliance with all Laws relating to pollution or protection of the environment, occupational health and safety or natural resources, including those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials ("Environmental Laws") and all applicable environmental, occupational

health and safety Permits (including, without limitation, all Permits described in Section 2.10) necessary for the operation of the Business as currently operated and the ownership, operation or business of Sellers with respect to the Transferred Assets, (iii) none of the Sellers and no prior owner or lessor of any Transferred Assets has Released any Hazardous Materials on any of the Transferred Assets or Real Estate in each case above in a manner, concentration or quantity that would reasonably be expected to give rise to a liability of the Sellers under any applicable Environmental Law, (iv) no Transferred Asset or Real Estate is listed or currently proposed for listing on the "National Priorities List" under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), or on the Comprehensive Environmental Response, Compensation and Liability Information System list maintained by the United States Environmental Protection Agency or any similar state list of sites requiring investigation or cleanup, (v) Sellers have provided to Buyer all written reports of environmental investigations in their possession with respect to the Transferred Assets and the Real Estate, (vi) no Seller has received any written notice alleging a violation of, or liability under, Environmental Laws except for matters that have been fully resolved with no further liability or obligation to the Sellers, and (vii) none of the Transferred Assets are the subject of liens or financial assurance requirements under any Environmental Law. This Section 2.13 contains the sole and exclusive representations and warranties of Sellers relating to environmental health and safety matters, including matters arising under Environmental Laws or relating to Hazardous Materials.

Section 2.14 Insurance. Insurance policies or binders of insurance or programs of self-insurance in the types and amounts listed in Section 2.14 of the Sellers' Disclosure Schedule are valid and currently in full force and effect. Section 2.14 of the Sellers' Disclosure Schedule sets forth all historic, occurrence-based policies in force by name of insurer, policy number, year, and limits of coverage. Sellers have paid, or caused to be paid, all premiums due under such policies and are not in default with respect to its obligations under any such policy. Sellers maintain insurance coverage with reputable insurers for the Business and each Seller and their respective properties and assets (including the Transferred Assets) of a type and in amounts typical of similar companies engaged in the respective businesses in which Sellers are engaged. No notice of cancellation or termination has been received with respect to any such policy and all such insurance policies are sufficient for compliance with all requirements of Law and of all agreements to which any Seller is a party or otherwise bound and are valid, outstanding, collectible, and enforceable policies, subject to any exception as could not, individually or in the aggregate, be reasonably expected to have a Company Material Adverse Effect or prevent or materially delay the ability of any Seller to consummate the transactions contemplated hereby. No Seller has received written notice from any insurance company or board of fire underwriters of any defects or inadequacies that would materially adversely affect the insurability of, or cause any material increase in the premiums for, insurance covering the Business, any Transferred Asset, or any Seller or any of their respective properties or assets that have not been cured or repaired to the satisfaction of the party issuing the notice, except as could not have and could not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

Section 2.15 Seller Material Contracts.

(a) Sections 2.15(a)(1) through 2.15(a)(8) of the Sellers' Disclosure Schedule list each of the following Contracts to which any Seller is a party or by which such Seller is bound